# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION – BAY CITY

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Boyce Hydro, LLC, *et al.*, | ) Case No. 20-21214 *et al.* |
| | ) (Jointly Administered) |
| Debtors.[1] | ) |
| | ) Honorable Daniel S. Opperman |

## FOURTH MODIFIED JOINT CONSOLIDATED
## CHAPTER 11 PLAN OF LIQUIDATION

Dated: February 23, 2021

Matthew E. McClintock, Esq.
Dan C. Curth, Esq.
**GOLDSTEIN & MCCLINTOCK LLLP**
111 W. Washington Street, Suite 1221
Chicago, Illinois 60602
Tel.: (312) 337-7700
Fax: (312) 277-2305
Email: mattm@goldmclaw.com
danc@goldmclaw.com

*Counsel to the Debtors*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Boyce Hydro, LLC (6694), Case No. 20-21214 and (ii) Boyce Hydro Power, LLC (3034), Case No. 20-21215.

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION – BAY CITY

## FOURTH MODIFIED JOINT CONSOLIDATED
## CHAPTER 11 PLAN OF LIQUIDATION

The Debtors (as defined below) hereby propose the following joint plan of liquidation pursuant to section 1121(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

The Plan constitutes a liquidating Chapter 11 plan for the Debtors and provides for the distribution of the Debtors' assets already liquidated or to be liquidated over time to Holders of Allowed Claims in accordance with the terms of the Plan. The Plan contemplates the establishment of a Liquidating Trust, *inter alia*, to implement the terms of the Plan and make distributions in accordance therewith. Except as otherwise provided by Order of the Bankruptcy Court, Distributions will likely occur at various intervals after the Effective Date. The Plan also includes a brief history of the Debtors and their businesses and a liquidation analysis as required by Section 1190 of the Bankruptcy Code.

**Importantly, this Plan, and many of the settlements and agreements reflected herein, which have been the by-product of extensive negotiations between many parties, are contingent the Insurance Settlement Approval Order (as defined below) being approved contemporaneously with the Confirmation Order. If the Insurance Settlement is not approved, the Plan would need to be materially revised. In the interests of brevity, the Plan does not seek to note or condition each provision that is conditioned on entry of the Insurance Settlement Approval Order, but rather globally notes here that approval of the Insurance Settlement is a condition precedent to Confirmation.**

**The Plan provides for substantive consolidation of the assets and liabilities of the Debtors and several other affiliated entities as described herein. Accordingly, the assets and liabilities of the Debtors and the other consolidated entities are deemed the assets and liabilities of a single administratively consolidated entity. Claims filed against both Debtors seeking recovery of the same debt shall be treated as a single, non-aggregated Claim against the consolidated Estates to the extent that such Claim is an Allowed Claim.**

**This Plan shall serve as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases and the affiliated entities as described herein.**

All Holders of Claims and Equity Interests are encouraged to read the Plan carefully before voting to accept or reject the Plan.

## ARTICLE I.
## DEFINITIONS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

A.    **Rules of Interpretation, Computation of Time and Governing Law**

1.    For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and the neutral gender; (b) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document, an exhibit to be Filed, or an exhibit already Filed, shall mean such document or exhibit, as it is or as it may be amended, modified or supplemented; (d) unless otherwise specified, all references in the Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to the Plan; (e) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form in the Plan that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning assigned to such term in the Bankruptcy Code.

2.    Except as otherwise specifically provided herein, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

3.    Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release,

indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Michigan, without giving effect to the principles of conflict of laws thereof.

B.  **Defined Terms**

Unless the context otherwise requires, the following terms shall have the meanings ascribed to them below when used in capitalized form herein:

1.  *Administrative Claim* means a Claim for costs and expenses of administration of these Chapter 11 Cases Allowed under section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code incurred after the Petition Date, including, but not limited to: (a) any actual and necessary costs and expenses of preserving the Debtors' Estates and operating the business of the Debtors (such as wages, salaries, commissions for services, and payments for leased equipment); (b) compensation for legal, consulting, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 330, 331, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date; (c) all fees and charges assessed against the Debtors' Estates under section 1930, chapter 123 of title 28 of the United States Code; and (d) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court.

2.  *Administrative Claims Bar Date* means the date that is forty-five (45) days after the Confirmation Date.

3.  *Allowed* means, with respect to any Claim or Equity Interest, except as otherwise provided herein, any of the following:  (a) a Claim or Equity Interest that has been scheduled by one of the Debtors on its Schedules as other than disputed, contingent or unliquidated and as to which (i) no Debtor or any other party in interest has Filed an objection or (ii) no contrary proof of Claim has been Filed; (b) a Claim or Equity Interest that either is not a Disputed Claim or Equity Interest or has been Allowed by a Final Order; (c) a Claim or Equity Interest that is Allowed:  (i) in any stipulation with a Debtor establishing the amount and nature of such Claim executed prior to the Confirmation Date and approved by the Bankruptcy Court; (ii) in any stipulation with a Debtor establishing the amount and nature of such Claim executed on or after the Confirmation Date and, to the extent necessary, approved by the Bankruptcy Court; or (iii) in any contract, instrument, indenture or other agreement entered into or assumed in connection with the Plan; (d) a Claim relating to a rejected executory contract or unexpired lease that (i) is not a Disputed Claim or (ii) has been

allowed by a Final Order; or (e) a Claim or Equity Interest that is Allowed pursuant to the terms of the Plan.

4. *Applicable Policy Limits* means the limits of liability of the Insurance Policies in the following amounts: Federal Policy – $2,000,000.00 USD (aggregate); Evanston Policy $1,000,000.00 USD (aggregate), meaning that a maximum total of $3 million ($3,000,000.00 USD) in aggregate liability coverage is available under the Insurance Policies.

5. *Avoidance Actions* means any and all claims and causes of action against any Entity arising under sections 506, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or any other section of the Bankruptcy Code.

6. *Ballot* means each of the ballot forms distributed to each Holder of an Impaired Claim in which the Holder is to indicate acceptance or rejection of the Plan.

7. *Bankruptcy Code* means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. § 101, *et seq*., as amended from time to time.

8. *Bankruptcy Court* means the United States Bankruptcy Court for the Eastern District of Michigan.

9. *Bankruptcy Rules* are, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as both may be amended from time to time.

10. *Bar Date* means December 15, 2020, the deadline set forth in the Bar Date Notice (as subsequently extended) as the deadline for filing proofs of claim in the Chapter 11 Cases.

11. *Bar Date Notice* means the bar date notice approved by the Bankruptcy Court at Docket No. 284 establishing November 30, 2020 (later extended to December 15, 2020) as the last date for all parties to file Claims against the Estates arising prior to the Petition Date.

12. *BH* means Boyce Hydro, LLC, one of the Debtors.

13. *BHP* means Boyce Hydro Power, LLC, one of the Debtors.

14. *BM* means Boyce Michigan LLC.

15. *BM Condemnation Proceeds* means $270,000, the total compensation to BM under the Condemnation Settlement ($300,000 less an agreed $30,000 payment to Pat's Gradall, Inc. as provided for as part of the Condemnation Settlement).

16. *BM Substantial Contribution* means BM's agreement pursuant to the Contribution Agreement to have its assets and liabilities substantively consolidated with those of the Debtors.

17. *Boyce Trusts* means, collectively, W.D. Boyce Trust 2350, W.D. Boyce Trust 3649, and W.D. Boyce Trust 3650.

18. *Boyce Trusts Substantial Contribution* means the Boyce Trusts' agreement pursuant to the Contribution Agreement to have their assets and liabilities substantively consolidated with those of the Debtors.

19. *Business Day* means any day, excluding Saturdays, Sundays, or "legal holidays" (as defined in Bankruptcy Rule 9006(a)).

20. *Byline* means Byline Bank. *Byline Claim* means the Allowed Claim of Byline arising under the agreements, documents, and instruments delivered or entered into memorializing the USDA Loan and the SBA Loans issued by Byline (in each case, as amended, supplemented, restated, or otherwise modified from time to time) as of the Petition Date.

21. *Byline Causes of Action* means all causes of action that Byline has a lien on, including, without limitation, the HoldCo Causes of Action.

22. *Byline Collateral* mean all assets, whether owned by the Debtors or other entities, that are subject to the Byline Liens.

23. *Byline Deficiency Claim* means the Byline Claim less the aggregate amount of: (a) any principal payments received by Byline following the Petition Date and (b) any distributions Byline receives from the Fund A – Uncovered Claims Fund in the Liquidating Trust on account of the liquidation of Byline Collateral.

24. *Byline Liens* means the security interests and liens of Byline securing the Byline Claim.

25. *Byline-Covered Claim Settlement* means the agreement between Byline and certain holders of Covered Claims pursuant to which, among other things: (a) $315,000 of the Substantial Contributions will be allocated to the Fund A –

Uncovered Claims Fund and will be treated as the proceeds of Byline Collateral and paid to Byline (with the remainder of the Substantial Contributions being allocated to the Fund B – Covered Claims Fund); (b) any costs associated with pursuing the Byline Causes of Action, as well as net proceeds of the Byline Causes of Action, will be split between the Fund A – Uncovered Claims Fund (70%) and the Fund B – Covered Claims Fund (30%) notwithstanding the Byline Liens, *provided*, *however*, that Byline must approve in writing and in advance any agreement (such as an engagement of counsel) that would result in it becoming liable for any costs (and may decline to do so in its business judgment); (c) the net proceeds of all other Causes of Action, including Avoidance Actions, will be split 50-50 between the Fund A – Uncovered Claims Fund and the Fund B – Covered Claims Fund, and in consideration of same all costs associated with pursuing such Causes of Action will be borne by the Fund B – Covered Claims Fund, and reimbursed to Fund B prior to the 50-50 split of net proceeds; and (d) any costs associated with liquidating Byline Collateral other than the Byline Causes of Action shall be incurred either directly by Byline (if it liquidates such assets itself) or from the Fund A – Uncovered Claims Fund (if such assets are liquidated by the Liquidating Trustee).

26.    *Carved-Out Insurance Policy* means that certain State Farm personal "umbrella" liability insurance policy ($1 million aggregate) held by Lee and Michele Mueller.

27.    *Cash* means legal tender of the United States of America or equivalents thereof.

28.    *Causes of Action* means any claim, cause of action, chose in action, action, suit, demand, and any other debt, obligation, right, damage, remedy, controversy, agreement, promise, lien, variance, trespass, power, privilege, license, franchise, judgment, third-party claim, subrogation claim, guaranty claim, contribution claim, reimbursement claim, indemnity claim, counterclaim, right of setoff or recoupment, crossclaim, claim objection, defense to claim, and liability whatsoever of any kind or character relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise. Causes of Action also includes: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity belonging to the Estates; (b) any claim pursuant to sections 362, 502, and 510 of the Bankruptcy Code and any analogous provisions of applicable state law belonging to

the Estates; (c) all Avoidance Actions, including any claim, right or cause of action related to any and all Avoidance Actions (including, but not limited to, any fraudulent conveyance or fraudulent transfer claims the Debtors may have pursuant to sections 544, 548 and 550 of the Bankruptcy Code or applicable non-bankruptcy law); (d) any claim or defense including, but not limited to fraud, mistake, duress, and usury and any other defenses belonging to the Estates pursuant to section 558 of the Bankruptcy Code; and (e) any claim, right, or cause of action against any insiders, officers, directors, recipient of a fraudulent transfer, and/or related entities. For the avoidance of doubt, the term "Cause of Action" shall include any of the above-described rights and causes of action that were held by the entities subject to the Non-Debtor Substantive Consolidation and that are transferred to the consolidated Estate of BH on or after the Effective Date.

29.     *Channeling Injunction* means the permanent injunction provided for herein with respect to Covered Claims, which Channeling Injunction shall be specifically approved by, issued pursuant to, and included in, the Confirmation Order, but shall only be effective if the Insurance Settlement is approved.

30.     *Chapter 11 Cases* means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors on the Petition Date currently pending before the Bankruptcy Court and identified as Case No. 20-21214 (BH); and Case No. 20-21215 (BHP).

31.     *Claim* means a "Claim" (as defined in section 101(5) of the Bankruptcy Code) asserted against the Debtors (including as substantively consolidated hereunder), including, but not limited to: (a) any right to payment against, whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance, if such performance gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

32.     *Class* means a category of Holders of Claims against or Equity Interests in the Debtors as set forth in Article IV of the Plan.

33.     *Condemnation Actions* means the following state court condemnation lawsuits filed on July 31, 2020 pursuant to which FLTF, on behalf of the Counties, sought to acquire, without limitation, the HoldCo Dam Properties and certain other properties owned by BM: *County of Gladwin v. Sanford Hydro Property, LLC, et al.,* Case No. 20-10509-CC pending in the Circuit Court of Gladwin County,

Michigan and *County of Midland v. Sanford Hydro Property, LLC, et al.,* Case No. 20-7191-CC pending in the Circuit Court of Midland County, Michigan (collectively, the "*Condemnation Actions*").

34. *Condemnation Settlement* means the settlement reached by, among others, the Debtors, BM, the HoldCos, and FLTF, as approved by the Bankruptcy Court at Docket No. 297 (as the same may be amended) and in consent orders entered in each of the Condemnation Actions.

35. *Confirmation* means the entry of the Confirmation Order, subject to all conditions specified herein having been satisfied

36. *Confirmation Date* means the date upon which the Confirmation Order is entered on the docket in the Bankruptcy Case.

37. *Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider Confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, as the same may be adjourned from time to time.

38. *Confirmation Order* means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

39. *Consummation* means the occurrence of the Effective Date.

40. *Contribution Agreement* means that certain First Amended Contribution Agreement Filed at Docket No. 398-1 pursuant to which BM, the Boyce Trusts, and Smallwood Properties agreed, subject to the provisions thereof, to have their assets and liabilities substantively consolidated with the Estate of BH as part of this Plan.

41. *Covered Claims* means, collectively, all Claims (as defined in the Insurance Settlement Agreement) against the Debtors and the Insurance Settlement Released Parties, arising out of the Debtors' businesses and properties which would constitute covered claims under the terms of the Federal Policy and specifically including all Dam Breach Damages Claims (for the avoidance of doubt, and without limiting the generality of the foregoing, Avoidance Actions do not constitute "Covered Claims" hereunder).

42.    *Covered Subrogation Claims* means Covered Claims held by insurance companies that paid claims asserted by their insureds and that are asserting subrogation claims against the Debtors as a result.

43.    *Covered Claims Allowance Process* means, if the Insurance Settlement is approved, a robust process to be devised by the Liquidating Trustee and approved by the Bankruptcy Court following notice and hearing to (i) alert all Holders of Covered Claims of the opportunity to receive a Pro-Rata share of the Cash proceeds of the Fund B – Covered Claims Fund within the Liquidating Trust and (b) to reconcile submitted Covered Claims in order to accomplish a Distribution.

44.    *Dam Breach Damages Claim* means any Claim (as defined in the Insurance Settlement Agreement) in any way arising out of the Dam Breaches and resultant flooding, including, but not limited to, any Claim resulting from the Dam Breaches for: (a) general and/or specific damages, including any Claim for personal injury, wrongful death, emotional distress and similar claims, pavement fatigue, damage to culverts, ecosystem service losses, municipal budget adjustments/reallocation, lost revenue and tax impacts, local share of reimbursed clean-up costs, future estimated infrastructure costs, water service losses, lost landfill capacity, costs related to unmet housing and/or hazard mitigation costs; (b) damages for repair, depreciation and/or replacement of damaged, destroyed, and/or lost personal and/or real property; (c) damages for loss of the use, benefit, goodwill, and enjoyment of real and/or personal property; (d) damages for loss of wages, earning capacity and/or business profits and/or any related displacement expenses; (e) economic losses; (f) restitution; (g) fines or penalties; (h) any and all costs of suit, including all attorneys' fees and expenses, expert fees, and related costs, including all attorneys and other fees under any theory of condemnation; (i) for prejudgment and/or postpetition interest; (j) other litigation costs stemming from the Dam Breaches; and (k) declaratory and/or injunctive relief. For avoidance of doubt and without prejudice to the Debtors' right to object to any such Claim, "Dam Breach Damages Claim" shall not include any Administrative Expense Claims.

45.    *Dam Breaches* means the May 19, 2020 breach of the Edenville Dam and the subsequent overtopping and breach of the Sanford Dam.

46.    *D'Avenas* means Michel D'Avenas.

47.    *D'Avenas Substantial Contribution* means the agreement by D'Avenas, a former Trustee of the Boyce Trusts, to contribute $10,000 to the Fund B – Covered Claims Fund if the Insurance Settlement is approved.

48.     *Debtors* or *Debtors in Possession* means BH and BHP, as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, and as co-proponents of the Plan.

49.     *Disputed Claims or Equity Interest* means a Claim or Equity Interest, or any portion thereof: (i) listed on the Schedules as unliquidated, disputed, or contingent; (ii) is the subject of an objection or request for estimation Filed or is otherwise disputed by one or more of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; (iii) such Claim is in excess of the amount scheduled as other than disputed, contingent, or unliquidated; or (iv) is otherwise disputed by one or more of the Debtors or any other party in interest in accordance with applicable law, which dispute has not been withdrawn, resolved, or overruled by a Final Order.

50.     *Distribution* means any consideration given to any Entity by the Debtors or Liquidating Trust under the Plan.

51.     *Distribution Address* shall mean, for each Holder, the address as set forth on the Debtors' Schedules filed with the Bankruptcy Court, unless superseded by the address set forth on a timely filed proof of claim or some other writing Filed with the Bankruptcy Court and served upon the Debtors and / or Liquidating Trustee prior to a Distribution being effectuated.

52.     *Edenville HP* means Edenville Hydro Property LLC, one of the non-debtor affiliates. *Effective Date* means a Business Day after the Confirmation Date on which all conditions to the occurrence of the Effective Date herein have been satisfied and no stay of the Confirmation Order is in effect.

53.     *EGLE* means the Michigan Department of Environment, Great Lakes, and Energy.

54.     *EGLE Administrative Claim* means the administrative priority portion of the claim asserted by EGLE in the Chapter 11 Cases, as the same may be supplemented or amended, which EGLE Administrative Claim shall be subordinated by agreement between the Debtors and EGLE and treated as a Class 7 Claim as provided hereunder.

55.     *EGLE Consent Judgment* means that certain Consent Judgment dated December 5, 2019 and entered by the Circuit Court for the 55th Judicial Circuit, Gladwin County, Michigan in *Michigan Department of Environmental Quality v.*

*Boyce Hydro, LLC; Boyce Hydro Power, LLC; Boyce Michigan, LLC; Edenville Hydro Property, LLC; and Lee Mueller* (Case No. 2016-8538-CE), and for which *Boyce Michigan, LLC* owes a $68,000 civil fine and $84,000 stipulated penalty.

56. *EGLE Payment* is not a Claim, it means a payment of $95,000 to be made by the Liquidating Trust to EGLE as soon as practicable following the Effective Date, which EGLE Payment will be made from proceeds of assets received by the Liquidating Trust via the Non-Debtor Substantive Consolidation notwithstanding anything to the contrary in Articles VI or VII of this Plan or any procedures related to the Non-Debtor Substantive Consolidation Bar Date.

57. *EGLE Settlement* means the settlement between EGLE and the Debtors, which may be approved as part of the Confirmation Order if not approved by the Bankruptcy Court prior thereto, providing for EGLE to receive the EGLE Payment in consideration of EGLE agreeing not to file a motion against BM under Mich. Comp. Laws § 600.6116 in Case No. 2016-8538-CE in Gladwin County Circuit Court, agreeing not to object to the Plan or the Non-Debtor Substantive Consolidation, agreeing to subordinate the EGLE Administrative Claim, and agreeing that any and all monetary obligations of the Debtors, HoldCos, BM, and the Boyce Trusts under the EGLE Consent Judgment or otherwise shall be deemed satisfied upon receipt of the EGLE Payment.

58. *Entity* means a Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an Estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, the United States Trustee, or any other entity.

59. *Equity Interests* means any and all interests in the Debtors and the entities subject to the Non-Debtor Substantive Consolidation, including, without limitation, (i) a share in a corporation, whether or not denominated "stock," or similar security, and whether or not issued, unissued, authorized, or outstanding; (ii) a membership interest in a limited liability company; (iii) an interest of a limited partner in a limited partnership; (iv) an interest of a general partner in a general partnership; or (v) a warrant, option, contract, or right to purchase, sell, or subscribe to a share, security, or interest of a kind specified in (i), (ii), (iii), or (iv) of this definition. The Plan recognizes, however, as the Boyce Trusts are the ultimate equity holders of both the Debtors and the entities subject to the Non-Debtor Substantive Consolidation, and the beneficiaries of the Trusts would ultimately be the beneficiaries of any funds available on account of "Equity Interests" hereunder. As

such, for purposes of this Plan, including so as to simplify and not to delay the administration of the Liquidating Trust, all Equity Interests shall be canceled, and the Trust beneficiaries (in their existing percentages as of the Petition Date) shall be deemed to be the sole "Equity Holders" hereunder.

60.     *Estates* means the estates of the Debtors created pursuant to section 541 of the Bankruptcy Code upon commencement of the Chapter 11 Cases.

61.     *Evanston* means Evanston Insurance Company.

62.     *Evanston Policy* means the "follow-form" excess insurance policy issued by Evanston (Excess Liability Policy No. MKLV1EFX100412).

63.     *Federal* means Federal Insurance Company.

64.     *Federal Policy* means the general liability insurance policy issued by Federal (General Liability Policy No. 3581-70-35 WUC).

65.     *Federal Rules* means the Federal Rules of Civil Procedure, as amended from time to time.

66.     *FERC* means the Federal Energy Regulatory Commission.

67.     *FERC Claim* means all Claims asserted by FERC in the Chapter 11 Cases.

68.     *FERC Licenses* means all licenses and permits issued to one or more of the Debtors by FERC with respect to the HoldCo Dams.

69.     *File or Filed* means file or filed with the Bankruptcy Court via CM/ECF or via the Clerk's office in the Chapter 11 Cases or in the Stretto's electronic claims database.

70.     *Final Decree* means the decree contemplated under Bankruptcy Rule 3022.

71.     *Final Order* means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, with respect to the subject matter, that has not been reversed, stayed, modified, or amended, and is no longer subject to appeal, *certiorari* proceeding, or other proceeding for review, reargument, or rehearing, and as to which no appeal, *certiorari* proceeding, or other proceeding for review, reargument, or rehearing has been timely requested or is then pending and the time to file any such appeal, *certiorari* proceeding, or other proceeding for review,

reargument, or rehearing has expired or as to which any right to appeal, petition for *certiorari*, reargue, or seek rehearing shall have been waived in writing in form and substance satisfactory to the Committees.

72.     *FLOC* means Four Lakes Operation Corporation.

73.     *FLTF* means Four Lakes Task Force LLC.

74.     *Forfeited Distributions* means undeliverable or unclaimed Distributions relating to Allowed Claims, that are deemed forfeited pursuant to the Plan.

75.     *Four Lakes Entities* means together FLOC and FLTF.

76.     *Fund A – Uncovered Claims Fund* means the fund to be established within the Liquidating Trust for the benefit of Holders of Uncovered Claims.

77.     *Fund A Assets* means: (i) pursuant to and consistent with the terms of the Byline-Covered Claim Settlement, 70% of the net proceeds of the Byline Causes of Action, 50% of the proceeds of other Causes of Action, including Avoidance Actions, and $315,000 of the Substantial Contributions; (ii) the Estate Condemnation Proceeds as a result of the HoldCo Assignment Agreement and all other HoldCo assets contributed pursuant to the HoldCo Assignment Agreement; and (iii) all of the Debtors' assets other than Causes of Action, specifically including all rolling stock and equipment.

78.     *Fund B – Covered Claims Fund* means the fund to be established within the Liquidating Trust for the benefit of Holders of Covered Claims.

79.     *Fund B Assets* means: (i) the Applicable Policy Limits; (ii) pursuant to and consistent with the terms of the Byline-Covered Claim Settlement, 30% of the net proceeds of the Byline Causes of Action, 50% of the proceeds of other Causes of Action, including Avoidance Actions, and all Substantial Contributions other than the $315,000 being allocated to the Fund A – Covered Claims Fund; (ii) the right to remaining Fund A – Uncovered Claims Fund assets as provided for in connection with the treatment of Class 7 herein.

80.     *Governmental Entities* means the United States, any of the individual fifty states, any commonwealth, district, territory, municipality, foreign state, department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a foreign state, or other foreign or domestic government.

81.     *HoldCos* means, collectively, Edenville HP, Sanford HP, Secord HP, and Smallwood HP.

82.     *HoldCo Assets* means all assets of the HoldCos primarily consisting, following the Condemnation Settlement, of the right to receive the HoldCo Condemnation Proceeds.

83.     *HoldCo Assignment Agreement* means that certain Amended Assignment Agreement by and between the HoldCos, the Boyce Trusts, and the Debtors, the form of which will be attached to the Plan Supplement as <u>Exhibit A</u>.

84.     *HoldCo Causes of Action* means all Causes of Action that the HoldCos hold or have the right to assert, including, without limitation, all claims against third parties for damages relating to the HoldCo Dams, HoldCo Dam Properties, and Dam Breaches.

85.     *HoldCo Condemnation Proceeds* means $1,154,000, the total compensation to Secord HP and Smallwood HP under the Condemnation Settlement ($1,276,000 less $122,000 in aggregate payments to Pat's Gradall, Inc. and Gerace Construction Company, Inc. to resolve their mechanic's lien claims (as provided for as part of the Condemnation Settlement)), which HoldCo Condemnation Proceeds are contributed to the Liquidating Trust as provided for herein as a result of the HoldCo Assignment Agreement.

86.     *HoldCo Dam Properties* means, collectively, the Edenville Dam Properties, the Sanford Dam Property, the Secord Dam Property, and the Smallwood Dam Property.

87.     *Holdco Dams* means the four dams located on each of the HoldCo Dam Properties.

88.     *HoldCo Equity Interests* means the membership interests in the HoldCos, which membership interests are 100% owned by the Boyce Trusts.

89.     *HoldCo Substantial Contribution* means (a) the agreement of the HoldCos to contribute the HoldCo Condemnation Proceeds to the Fund A – Uncovered Claims Fund pursuant to the HoldCo Assignment Agreement and (b) the HoldCos' agreement to waive their right to a defense under the Insurance Policies if the Insurance Settlement is approved.

90.     *Holder* means any Entity owning or holding a Claim or Equity Interest.

91.    *Hultberg Substantial Contribution* means the following substantial contribution to the Chapter 11 Cases being made by Stephen Hultberg, one of two Co-Managing Members of the Debtors, as the same may be supplemented from time to time by written agreement and that is being agreed to if and only if the Insurance Settlement is approved: (a) the sum of $70,000.00 to the Fund B – Covered Claims Fund; and (b) a waiver of any right to a defense under the Insurance Policies.

92.    *Impaired* means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

93.    *Independent FERC Investigative Report* means the report that the independent investigation team that has been commissioned by FERC will be issuing regarding the cause(s) of the Dam Breaches.

94.    *Insider* shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

95.    *Insurance Policies* means together the Federal Policy and Evanston Policy.

96.    *Insurance Settlement* means the settlement embodied by the Insurance Settlement Agreement.

97.    *Insurance Settlement Agreement* means that certain settlement agreement entered into as of July 30, 2020 between and among the Debtors, BM, the Trusts, the HoldCos and the Insurer Parties, as the same has and may be amended from time to time.

98.    *Insurance Settlement Approval Order* means a Final Order of the Bankruptcy Court approving the Insurance Settlement Motion, if applicable.

99.    *Insurance Settlement Motion* means the motion that the Debtors Filed on at Docket No. 32 in the Chapter 11 Cases seeking approval of the Insurance Settlement and authorization to enter into the Insurance Settlement Agreement.

100.    *Insurance Settlement Released Parties* means Michele Mueller, Stephen Hultberg, and D'Avenas.

101.    *Insurance Settlement Resolution Date* means the date upon which the Insurance Settlement Motion is either granted or denied by a Final Order of the Bankruptcy Court, which date shall be no later than January 31, 2021.

102. *Insurer Parties* means together Federal and Evanston.

103. *Insurer Payments* means the payments that the Insurer Parties are required to make if the Insurance Settlement is approved being the Administrative Expense Contribution and Policy Limits payment (as such terms are defined in the Insurance Settlement Agreement).

104. *Lien* means any charge against or interest in property to secure payment of a debt or performance of an obligation.

105. *Liquidating Trust* means a common law trust to be established pursuant to the Plan for the sole and exclusive benefit of the Holders of Allowed Claims.

106. *Liquidating Trust Agreement* means that certain written agreement to be executed on or before the Effective Date among the Debtors and the Liquidating Trustee establishing Liquidating Trust and setting forth its terms and conditions and the powers of the Liquidating Trustee, as the same will be attached to the Plan Supplement as <u>Exhibit C</u> and may be amended from time to time prior to Confirmation.

107. *Liquidating Trust Assets* means (i) the Fund A Assets; (b) the Fund B Assets; (iii) all rights of the Liquidating Trust under the Plan, the Confirmation Order, and the Liquidating Trust Agreement; (iv) all books and records related to the Debtors and/or their Estates and for the avoidance of doubt, all assets of the Debtors and the entities subject to the Non-Debtor Substantive Consolidation will become Liquidating Trust Assets.

108. *Liquidating Trust Beneficiaries* means all Entities entitled to receive Distributions or payments from the Funds within the Liquidating Trust pursuant to the Plan.

109. *Liquidating Trust Expenses* means the reasonable and necessary expenses of administering the Liquidating Trust, including, without limitation, the fees and expenses of the Liquidating Trustee and his counsel, all as provided for in the Plan and Liquidating Trust Agreement.

110. *Liquidating Trustee* means Scott Wolfson of the law firm of Wolfson Bolton PLLC.

111. *Liquidation Analysis* means the liquidation analysis attached as <u>Exhibit B</u> to the Plan Supplement (as the same may be amended from time to time),

which reflects liquidation scenarios if the Insurance Settlement is approved and if it is rejected.

112. *Mueller Substantial Contribution* means the agreement by Michele Mueller to contribute $10,000 to the Fund B – Covered Claims Fund if the Insurance Settlement is approved.

113. *Mussel Death Claims* means the claim for insurance coverage under the Insurance Policies that was carved-out of the release the Insurer Parties at Section 2.2 of the Insurance Settlement Agreement and that involves possible coverage for claims asserted by the State of Michigan for freshwater mussel deaths and/or otherwise affecting the "ecosystem" of the Wixom Reservoir that allegedly occurred in policy years 2018 and 2019, as reflected in Federal Case No. 2:20-cv-00520 (W.D. MI).

114. *Non-Debtor Substantive Consolidation* means the substantive consolidation of BM, the Boyce Trusts, and Smallwood Properties, as contemplated hereunder (and subject to the conditions for same).

115. *Non-Debtor Substantive Consolidation Bar Date* means, if the Non-Debtor Substantive Consolidation is approved, the date that is 30 days after the Liquidating Trustee sends notice to known creditors of BM, the Boyce Trusts, and Smallwood Properties apprising them that they have 30 days from the issuance of the notice to file claims against the consolidated Estate of BH (for the avoidance of doubt, the Non-Debtor Substantive Consolidation Bar Date will only apply to persons and entities that would have had claims against BM, the Boyce Trusts, and Smallwood Properties), but no such claims shall be allowed if filed by an Insider of either of the Debtors or any Insider or beneficiary of BM or the Boyce Trusts

116. *Other Secured Claims* means all secured Claims other than those held by Byline, if any.

117. *Person* means a "person" as defined in section 101(41) of the Bankruptcy Code.

118. *Petition Date* means July 31, 2020 for the Debtors, and shall be deemed to mean the Effective Date for the entities subject to the Non-Debtor Substantive Consolidation.

119. *Plan* means this Joint Chapter 11 Plan of Liquidation, including, without limitation, any and all exhibits, supplements, appendices and schedules

thereto, either in its present form or as it may be amended, modified, altered or supplemented from time to time.

120.    *Plan Supplement* means one or more supplements to the Plan, which supplements shall be filed from time to time and will generally contain exhibits to the Plan and other documents in support of the Plan (and amendments to such documents as needed).

121.    *Priority Claim* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

122.    *Priority Tax Claim* means a Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

123.    *Professional* means any Person or other Entity that either (a) has been retained in the Chapter 11 Cases by a Final Order of the Bankruptcy Court pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code or otherwise, potentially including, but not limited to: Goldstein & McClintock LLLP; Steinhardt Pesick & Cohen, P.C.; and Burgoyne Appraisal Company (b) seeks compensation or reimbursement of expenses in connection with these Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

124.    *Professional Fee Carve-Out* means the carve-out from Byline's collateral for the fees and expenses incurred by Professionals in the Chapter 11 Cases as contained in the various cash collateral orders that have been entered in the Chapter 11 Cases.

125.    *Pro Rata* means proportionately so that with respect to an Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of a particular Allowed Claim to (ii) the amount of that particular Allowed Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class (or with respect to Classes 5 and 6, the Classes) in which the particular Allowed Claim is included to (ii) the amount of all Allowed Claims in that Class (or with respect to Classes 5 and 6, the Classes)

126.    *Rejection Claims Bar Date* means either (a) the Bar Date (for Holders of Claims stemming from the rejection of an executory contract or lease that occurred at least 30 days prior to the Bar Date) or (b) for all other such claims, the thirtieth (30th) day after the Effective Date. The Holder of any such Claims stemming from the rejection of as executory contract or lease not Filed by the

Rejection Claims Bar Date shall be forever barred from asserting such Claims against the Debtors, their Estates, the Liquidating Trust, or any of their respective properties and interests.

127. *Released Parties* means each Entity granted a release in Article X.H of the Plan.

128. *Releases* means the plan releases described in Article X.H of the Plan, which Releases, unlike the releases proposed separately for Insurance Settlement Released Parties in connection with the Insurance Settlement, are not dependent on approval of the Settlement Agreement.

129. *Sanford HP* means Sanford Hydro Property LLC, one of the non-debtor affiliates.

130. *SBA Loans* means the following loans: (1) SBA Loan 4917845007 (Bank #16499) dated November 28, 2011 in the original loan amount of $421,000.00 entered into by Sanford HP, BH, and BHP, as borrowers; (2) SBA Loan 4917795005 (Bank #16498) dated November 28, 2011 in the original loan amount of $844,000.00 entered into by Sanford HP, BH, and BHP, as borrowers; (3) SBA Loan 4917955005 (Bank #16501) dated November 28, 2011 in the original loan amount of $636,000 entered into by Edenville HP, BH, BHP, as borrowers; (4) SBA Loan 4918065000 (Bank #16500) dated November 28, 2011 in the original loan amount of $1,297,000 entered into by Edenville HP, BH, BHP, as borrowers; (5) SBA Loan 49182850-07 (Bank #16504) dated November 28, 2011 in the original amount of $730,000 entered into by Secord HP, BH, BHP, as borrowers; (6) SBA Loan 49181950-04 (Bank #16503) dated November 28, 2011 in the original loan amount of $390,000 entered into by Secord HP, BH, BHP, as borrowers; and (7) SBA Loan 49183150-03 (Bank #16502) dated as of November 28, 2011 in the original loan amount $2,500,000 entered into by Sanford HP, BH, BHP, as borrowers.

131. *Schedules* means the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors in accordance with section 521 of the Bankruptcy Code and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended.

132. *Secord HP* means Secord Hydro Property LLC, one of the non-debtor affiliates.

133. *Secured Claim* means: (a) a Claim that is secured by a Lien on a property in which an Estate has an interest, which Lien is valid, perfected and

enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in an Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) a Claim Allowed under the Plan as a Secured Claim.

134. *Smallwood Dam Property* means the real estate parcel comprising the recorded Smallwood Dam tax parcel owned by Smallwood HP in Gladwin County in Michigan.

135. *Smallwood HP* means Smallwood Hydro Property LLC.

136. *Smallwood Properties* means Smallwood Properties, LLC.

137. *Smallwood Properties Substantial Contribution* means Smallwood Properties' agreement pursuant to the Contribution Agreement to have its assets and liabilities substantively consolidated with those of the Debtors.

138. *Stretto* means Bankruptcy Management Solutions, Inc. d/b/a Stretto, the Debtors claims and noticing agent.

139. *Stretto Claim Reconciliation Work* means the work performed by Stretto to analyze and categorize – including entering into Stretto's electronic claims database – all of the claims filed in the Chapter 11 Cases (primarily consisting of thousands of claims filed by Holders of Dam Breach Damages Claims).

140. *Subchapter V Trustee* means Mark H. Shapiro of Steinberg, Shapiro & Clark.

141. *Substantial Contributions* shall mean all contributions that Insurance Settlement Released Parties and other parties have made or committed to make (in each case including, at a minimum, their agreement to waive defense coverage under the Insurance Policies, and in each case conditioned on approval of the Insurance Settlement except where expressly noted otherwise) and including: (i) the BM Substantial Contribution; (ii) the Boyce Trusts Substantial Contribution; (iii) the Byline Substantial Contribution; (iv) the HoldCo Substantial Contribution; (v) the Hultberg Substantial Contribution; (vi) the Mueller Substantial Contribution; (vii) the Smallwood Properties Substantial Contribution; and (viii) the D'Avenas Substantial Contribution.

142. *Uncovered Claims* means all Claims asserted against the Debtors' and their estates other than Covered Claims.

143.     *Unsecured Claim* means any Claim against one or more of the Debtors other than an Administrative Claim, a Priority Tax Claim, a Secured Claim, a Priority Claim, or an Equity Interest.

144.     *USDA Loan* means the USDA Loan 26-056-380858018 dated October 16, 2014 in the original loan amount of $2,500,000.00 entered into by Sanford HP, BH and BHP, as borrowers.

145.     *UST Fees* means fees owed to the Office of the United Trustee pursuant to 28 U.S.C. § 1930(a)(6).

## ARTICLE II.

## BRIEF BACKGROUND

This Section provides a brief overview and history of the Debtors' business operations and summarizes the events leading up to the filing of the Chapter 11 Cases and certain key events in the Chapter 11 Cases. Creditors and other parties may disagree with statements contained in this Brief Background. The Brief Background is for informational purposes only and shall not be deemed accurate or have preclusive effect in any future proceeding.

### A.     Overview of the Debtors

1.     The Debtors have historically operated the Holdco Dams. The Holdco Dams are located along the Tittabawassee River in Midland and Gladwin counties in Michigan and historically were used to generate electricity.

### B.     Corporate and Operational Structure

2.     The Debtors never themselves owned the HoldCo Dams. Rather, each HoldCo (four non-Debtor entities) was owned a corresponding HoldCo Dam (the Dam real estate, associated power stations, turbines, switchgear, spillways, and other physical improvements, and flowage rights).  None of the HoldCos had employees.

3.     BHP, one of the two Debtors, holds the FERC licenses for the three currently licensed Holdco Dams (Sanford, Secord, and Smallwood), but as discussed below, the Dam Properties have now been transferred as a result of Condemnation Actions brought by governmental entities. Accordingly, the HoldCos no longer own the "project properties" that the licenses relate to. BHP has historically not had employees, and its main expenses are comprised of its lease obligations, funding to

BH under an operating and maintenance agreement ("*O&M Agreement*"), and professional fees.

4.      BH, the other Debtor, operated the Holdco Dams pursuant to the O&M Agreement with BHP. BH owns vehicles, equipment, furniture, computers, tools and other personal property needed for operations. As of the Petition Date, BH had four full time employees, and now has two. BH receives funding from BHP under the O&M Agreement, and its expenses are largely comprised of payroll and, historically, operational expenses relating to the Holdco Dams.

### C.      The Debtors' Capital Structure

5.      *Secured Debt*: The Debtors and HoldCos have one U.S. Department of Agriculture ("*USDA*") loan and seven U.S. Small Business Association ("*SBA*") loans, all issued through Byline Bank ("*Byline*") either directly or as assignee, and all cross-collateralized. The loans are as follows:

| Loan | Date Issued | Borrower(s) | Guarantor(s) | Original Principal Amount | Approximate Amount Owed as of July 30, 2020 |
|---|---|---|---|---|---|
| SBA Loan 49178450-07 (Bank #16499) | 11/28/11 | Sanford HP, BH, BHP | Edenville HP, Secord HP, Smallwood HP, Boyce Trusts | $421,000 | $346,286.53 |
| SBA Loan 49177950-05 (Bank #16498) | 11/28/11 | Sanford HP, BH, BHP | Edenville HP, Secord HP, Smallwood HP, Boyce Trusts | $844,000 | $700,814.03 |
| SBA Loan 49179550-05 (Bank #16501) | 11/28/11 | Edenville HP, BH, BHP | Sanford HP, Secord HP, Smallwood HP, Boyce Trusts | $636,000 | $530,502.03 |
| SBA Loan 49180650-00 | 11/28/11 | Edenville HP, BH, BHP | Sanford HP, Secord HP, Smallwood | $1,297,000 | $1,083,227.52 |

| | | | | | |
|---|---|---|---|---|---|
| (Bank #16500) | | | HP, Boyce Trusts | | |
| SBA Loan 49182850-07 (Bank #16504) | 11/28/11 | Secord HP, BH, BHP | Edenville HP, Sanford HP, Smallwood HP, Boyce Trusts | $730,000 | $608,641.51 |
| SBA Loan 49181950-04 (Bank #16503) | 11/28/11 | Secord HP, BH, BHP | Edenville HP, Sanford HP, Smallwood HP, Boyce Trusts | $390,000 | $317,476.93 |
| SBA Loan 49183150-03 (Bank #16502) | 11/28/11 | Smallwood HP, BH, BHP | Edenville HP, Sanford HP, Secord HP, Boyce Trusts | $339,000 | $273,255.50 |
| USDA Loan 26-056-380858018 (Bank #21912) | 10/16/14 | Sanford HP, BH, BHP | Edenville HP, Secord HP, Smallwood HP, Boyce Trusts | $2,500,000 | $2,246,799.75 |
| **TOTAL:** | | | | $7,157,000 | $6,107,003.80 |

6.      Byline asserts that it has senior liens on substantially all assets of the Debtors and the HoldCos to secure the foregoing loans.

7.      *Unsecured Debt*: As of the Petition Date, the Debtors had over $1.1 million in aggregate liquidated unsecured debts, some of which are disputed. Approximately half of that amount (Claims of Pat's Gradall, Inc. and Gerace Construction Company, Inc.) will be resolved and eliminated as a part of the Condemnation Settlement. In addition, individuals and business owners whose property was damaged in the Flooding have asserted millions of dollars in disputed and unliquidated litigation claims against the Debtors, including via numerous class action and individual lawsuits that have been filed since the Flooding occurred.

## D.      The History of the Debtors' Businesses

8.     The Holdco Dams were constructed in the early 1920s and commenced electrical generation in 1925. In addition to generating electricity, they have historically provided real estate development value for scores of subdivision developers, residential contractors, material suppliers and related businesses. More in depth background on the Debtors' businesses and the events leading to the Chapter 11 Cases can be found in the declaration submitted by Lee W. Mueller, the Debtors' Co-Managing Member, at the following URL:

https://cases.stretto.com/public/X097/10550/PLEADINGS/1055008202080000000056.pdf

9.     The HoldCos acquired the Holdco Dams in 2006 and immediately began making improvements, including those required by FERC to improve their safety. Through April 2020, the Debtors have spent in excess of $6 million on capital improvements to the Holdco Dams, generally for improvements required by the Federal Energy Regulatory Commission ("*FERC*"). Due to the limited revenue generated by the Holdco Dams, much of the money needed to make these improvements was borrowed by the Debtors and was being re-paid through operating revenue over time.

10.     One FERC-required improvement that the Debtors were unable to afford was the addition of spillway capacity at the Edenville Dam, which was estimated to cost in excess of $8,000,000. Ultimately, this resulted in the Debtors losing the FERC license for the Edenville Dam, which had a materially negative impact on the Debtors' revenue.

## E.     Events Leading to the Chapter 11 Filings

11.     On Friday, May 15, BH became aware that a major storm was approaching. Concerned about safety, BH began unilaterally lowering the water levels at the impoundments behind all four of the Dams in an effort to reduce the water levels to the bottom limits of the allowable range or somewhat lower if possible.

12.     Over the next several days, BH operators worked around the clock to maintain or control the water level increases in the impoundments and monitor the structural integrity of the Dams. Notwithstanding these efforts – which are described in more detail in the Declaration – the Edenville Dam was breached. Once water began flowing through the saturated soil and down the backside of the 48-foot-high

embankment, the upper portion of the downstream embankment slid down and collapsed creating an uncontrolled breach. The eastern end of earthen embankment catastrophically failed thus discharging the full volume and contents of the reservoir downriver into the Sanford Reservoir.

13. As a result of the foregoing the Sanford Dam earthen embankment was quickly overtopped and demolished. The Dam Breaches exacerbated the already historic downriver Flooding that extended from the Village of Sanford to the city of Midland. The additional downstream flood wave emanating from the Sanford Dam overtopping and inundation forced thousands of residents to evacuate and further inundated many homes and businesses with elevated floodwaters.

## The Immediate Aftermath of the Dam Breaches

14. Immediately after the Dam Breaches, FERC ordered the Debtors to lower water levels behind the two Dams that did not breach as a precaution. EGLE also ordered the Debtors to complete an engineering assessment of the Tobacco side of the Edenville Dam because there were concerns about its stability. But FERC's order meant that the Debtors could not generate electricity, and suddenly had no revenue at a time when they desperately needed cash for immediate stabilization measures and myriad other costs. They were running out of cash rapidly with no revenue source to replenish it.

15. Moreover, on May 22, 2020, three days after the Dam Breaches, FLTF sent a letter purporting to terminate the FLTF Purchase Agreement. On June 19, 2020, FLTF reduced its offer from $16 million to $100,000, and FLTF threatened to initiate condemnation proceedings if the offer was not accepted by June 25, 2020. Accepting such an offer would have been devastating for the Debtors' creditors, including Byline, and the Debtors and their affiliates did not believe it came close to approximating the value of the hundreds of properties FLTF was trying to condemn. The Debtors attempted to engage in pre-petition discussions with FLTF but were not able to reach agreement. *See* Declaration for greater detail.

16. The Debtors also began to be inundated with lawsuits – both individual lawsuits and class actions – from parties seeking redress for the Flooding that impacted their homes and businesses. While the Debtors strongly dispute liability, they also saw that the amount of damage dwarfed the aggregate Policy Limits ($3 million) of their liability coverage under the Insurance Policies, and they wanted to achieve a favorable outcome for Entities impacted by the Flooding (regardless of

fault). The Debtors began to talk to the Insurer Parties about a settlement that would bring in more than the Policy Limits immediately for the benefit of Holders of Covered Claims (ideally avoiding years of litigation).

## F.    The necessity and objectives of the chapter 11 filings

17.    The need for bankruptcy protection was fairly apparent in light of the above circumstances, and the Chapter 11 Cases were filed to obtain a "breathing spell" to maximize outcomes for creditors. At a high-level, the Debtors' efforts to accomplish this have fallen into the following two primary categories.

18.    ***Maximizing Recoveries from the HoldCo Dams and the Debtors' Physical Assets.*** As discussed above, the HoldCo Dams are not owned by the Debtors, but the Debtors lease and manage them, and negotiated the HoldCo Contribution Agreement to ensure that proceeds realized from the HoldCo Assets would flow through the bankruptcy and inure to the benefit of Byline, the Debtors' senior secured creditor. Extracting value from the HoldCo Dams was challenging for numerous reasons including the fact that two of them were breached, none were currently generating revenue, and that all of them (and hundreds of other properties owned by affiliates of the Debtors) are subject to the Condemnation Actions filed by FLTF on behalf of Midland and Gladwin Counties ("chilling" interest in the assets that would otherwise exist). After extensive negotiations with FLTF and other parties about a possible consensual transfer the Debtors reached a settlement which resulted in, among other things, FLTF agreeing to pay the HoldCo Condemnation Proceeds. The settlement also resolved two mechanics' lien Claims as noted above that reduced the Debtors' unsecured "trade" claims by approximately half. Under the Plan, the HoldCo Condemnation Proceeds are contributed to the Fund within the Liquidating Trust that benefits Byline Bank and unsecured "trade" creditors (the *Fund A* – Uncovered Claims Fund). The Debtors have also been exploring how best to maximize the value of their own tangible assets (primarily vehicles and equipment), but the expected proceeds are not expected to be sufficient to pay Byline's Secured Claim in full, so without more, unsecured creditors are not likely to see a recovery. *See* Liquidation Analysis.

19.    ***Insurance Settlement / Plan and Liquidating Trust.*** Prior to the bankruptcy filings, the Debtors reached agreement with their liability insurers with respect to the Insurance Settlement. The Insurance Settlement brings the Policy Limits ($3 million in the aggregate) into the estates immediately, plus an additional $250,000 to help defray administrative expenses. As a condition of making the

foregoing payments, the Insurer Parties are requiring third party releases for three "Insurance Settlement Released Parties", and as a result of receiving the releases, the Insurance Settlement Released Parties and numerous other entities affiliated with the Debtors are making contributions that benefit creditors under the Plan. The Debtors believe the Insurance Settlement is extremely beneficial. It would ensure a recovery for Holders of Covered Claims.

## G. Significant Events Which Have Occurred During the Debtor's Chapter 11 Case

20. At a more granular level, the following provides an overview of developments to date in the Debtors' Chapter 11 Cases.

### I. Cash Collateral Motion

21. At the outset of this case, the Debtors filed a motion for use of cash collateral which was granted by the Court. The Debtors have since obtained a series of interim cash collateral orders that have allowed them to continue to operate. A final hearing to consider the motion for use of cash collateral is scheduled for October 20, 2020.

### II. Administrative Motion

22. To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Debtor filed first day pleadings seeking orders authorizing the joint administration of the Debtors' Chapter 11 Cases and establishing certain notice and administrative procedures.

### III. Operational Relief

23. The Debtors also filed motions for entry of an order (1) authorizing the Debtors to (A) maintain insurance policies and programs; (B) honor all insurance obligations, and (C) continue premium financing agreement, and (II) related relief. This motion was filed to allow the Debtors to maintain their insurance obligations postpetition.

### IV. Appointment of Subchapter V Trustee

24.     On August 3, 2020, the Office of the United States Trustee appointed Mark H. Shapiro, of Steinberg, Shapiro & Clark, as subchapter V trustee in the Debtors' Chapter 11 Cases.

## V.     The Insurance Settlement Motion

25.     On August 6, 2020, the Debtors filed the Insurance Settlement Motion. The Insurance Settlement is inextricably tied into the Plan (in the sense that it very materially impacts creditor recoveries and it can only really be effectuated through a Plan). The Insurance Settlement was initially opposed by a number of parties representing holders of Dam Breach Damages Claims, but it is expected that all such objections will be resolved consensually in connection with Confirmation.

## VI.     The FLTF Condemnation Actions and Lift Stay Motion

26.     On July 31, 2020, FLTF commenced the Condemnation Actions. As described above, these were settled after extensive negotiation resulting in the HoldCo Condemnation Proceeds that are providing most of Byline's recovery under the Plan.

## VII.     Challenge to Subchapter V Election Status

27.     On August 18, 2020, a group of tort claimants filed a motion to revoke the Debtors' election to proceed under subchapter V of chapter 11 or, in the alternative, to appoint a committee to represent the tort claimants' interests. The Debtors, among others, opposed the motion and the request to appoint a committee to represent tort claimants. On September 10, 2020, the Bankruptcy Court entered an order allowing the Debtors' chapter 11 cases to continue as subchapter V small business cases and finding no cause exist to appoint a committee at that time.

## VIII.     Motion to Designate Class Counsel

28.     On September 18, 2020, a group of individuals, through their counsel for the application of Bankruptcy Rule 7023 to permit the filing of a proof of claim on behalf of absent Class members and to appoint the law firms of Grant & Eisenhofer P.A., Morgan & Morgan P.A., Sommers Schwartz, P.C. and Liddle & Dubin, P.C., collectively, as Interim Class Counsel. Separate plaintiffs' groups have opposed the Motion to Designate Class Counsel.

## XI.     EGLE's Administrative Claim

29.     To alleviate the danger EGLE believed was posed by the Tobacco side of the Edenville dam, EGLE expended funds to ensure work commenced on the project prior to the end of the 2020 calendar year so the project could be substantially complete before the arrival of spring flows in 2021. EGLE filed its proof of claim on December 11, 2020 and designated $516,030 of its claim as a priority administrative claim because it believed the funds it expended towards the emergency work on the dam gave rise to an administrative expense.

30.     The Debtors informally objected to the administrative claim asserted by EGLE, and EGLE made arguments in support. However, the Debtors also pointed out that they did not believe it would have been possible to pay such a large administrative claim, and that asserting it would only serve to threaten confirmation of the Plan, put creditor recoveries at risk, and result in likely litigation.

31.     Separately, EGLE had also had claims under the EGLE Consent Judgment and asserted that the claims were secured by liens against properties owned by Smallwood Properties and Boyce Michigan, entities subject to the Non-Debtor Substantive Consolidation. As with the administrative claim, the Debtors engaged in discussions aimed at resolving those claims and avoiding a motion from being filed in Michigan circuit court against non-Debtors and a possible objection to the proposed Non-Debtor Substantive Consolidation. Ultimately, in part because the Debtors do not have funds to pay the administrative expense claim, and in part because EGLE did not want to see creditor recoveries jeopardized, the Debtors and EGLE reached the EGLE Settlement. Pursuant to the EGLE Settlement, EGLE receives $95,000 on account of its EGLE Consent Judgment claim (materially less than the $152,000 is asserted was owed) and to subordinate the EGLE Administrative Expense Claim to a Class 7 Claim.

## ARTICLE III.
## ADMINISTRATIVE CLAIMS; PRIORITY TAX CLAIMS

### A.     Non-Professional Administrative Claims

Each Allowed Administrative Claim, other than Administrative claims held by Professionals, that has not been paid by the Debtors in the ordinary course of business prior to the Effective Date shall be paid by the Debtors or the Liquidating Trust (i) in full, in Cash, in such amounts as such Administrative Claim is Allowed by the Bankruptcy Court upon the later of the Effective Date or the date upon which such Administrative Claim is Allowed or (ii) upon such other terms as may be agreed

upon between the Holder of such Administrative Claim and the Liquidating Trustee (in particular, EGLE has agreed to a different treatment of the EGLE Administrative Claim as provided for below, and $75,000 of the Stretto Administrative Claim is being deferred as provided for hereunder).

Any person or entity (other than a Professional) that believes that it is the Holder of an Administrative Claim that has not previously been Filed shall file a request for allowance or payment of such alleged Administrative Claim by the Administrative Claims Bar Date. Any such person or entity who fails to file such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such alleged Administrative Claim against the Debtors or the Liquidating Trust in any venue and in any manner, and the Debtors and the Liquidating Trust and their property shall be forever discharged from any and all indebtedness or liability with respect to or arising from such alleged claim.

### B. Professional Administrative Claims

The unpaid portion of any Allowed Administrative Claim held by a Professional as of the Effective Date shall be paid by the Debtors or the Liquidating Trust (i) in full, in Cash, in such amounts as such Administrative Claim is Allowed by the Bankruptcy Court upon the later of the Effective Date or the date upon which such Administrative Claim is Allowed or (ii) upon such other terms as may be agreed upon between the Holder of such Administrative Claim and the Liquidating Trustee. For the avoidance of doubt, prior to a Professional receiving a payment hereunder, the Professional shall first apply any previously unapplied retainer balance held by such Professional against its Allowed Administrative Claim.

All Professionals (other than ordinary course professionals, who can be paid in the ordinary course of business) shall file a final fee application by the Administrative Claims Bar Date for such Professional's work through the Effective Date.

### C. Priority Tax Claims

Upon the later of the Effective Date or the date upon which such Priority Tax Claim is Allowed, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim or (ii) such other treatment as to which the Debtors and such Holder have agreed upon.

# ARTICLE IV.
## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### A.   **Summary**

1.   The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified, but the treatment for such unclassified claims are set forth in Article III.

As set forth in greater detail below, the Plan provides for the substantive consolidation of the Estates into a single Estate for all purposes associated with Confirmation and Consummation of the Plan. As a result of such substantive consolidation, each Class of Claims and Interests will be treated as against a single consolidated Estate, and the assets of the Debtors' Estates are being combined and treated as a single Estate for purposes of making Distributions to such Classes, notwithstanding the otherwise separate corporate identity of each of the Debtors.

2.   The classification of Claims against and Equity Interests in the Debtors pursuant to the Plan is as follows:

| Class | Impairment | Voting Right |
|---|---|---|
| Class 1 – Other Priority Claims – §507(a)(4) | Unimpaired | Not entitled to vote |
| Class 2 – Byline Secured Claim | Impaired | Entitled to vote |
| Class 3 – Other Secured Claims | Unimpaired | Not entitled to vote |
| Class 4 – General Unsecured Claims | Impaired | Not entitled to vote |
| Class 5 – Covered Claims – Direct Claims | Impaired | Not entitled to vote |
| Class 6 – Covered Claims – Subrogation Claims | Impaired | Not entitled to vote |
| Class 7 – Subordinated Governmental Claims | Impaired | Not entitled to vote |
| Class 8 – Equity Interests | Impaired | Not entitled to vote |

B.     **Treatment of Claims and Equity Interests**

1.     Class 1:  Other Priority Claims – §507(a)(4)

     **1.**     *Classification*: Class 1 consists of all Claims entitled to priority under §507(a)(4) of the Bankruptcy Code.

     **2.**     *Treatment*: All Allowed Class 1 Claims shall either (i) be paid by the Liquidating Trust in full, in cash, upon the later of the Effective Date, or the date on which such claim is Allowed or (b) receive such other treatment as is agreed to by the Holder of the Class 1 Claim and the Liquidating Trustee.  To the extent that the Allowed amount of any Class 1 Claim exceeds the priority limitation of Bankruptcy Code § 507(a)(4), the Holder of such a claim shall have an Allowed Class 4 Claim to the extent of the excess.

     **3.**     Voting:  Class 1 Claims are Unimpaired.  Holders of Class 1 Claims are deemed to accept the Plan and shall not be entitled to vote.

2.     Class 2:  Byline Secured Claim

     **1.**     Classification:  Class 2 Byline Secured Claim consists of the secured portion of the Byline Claim

     **2.**     Treatment:   In full satisfaction of the Byline Secured Claim, Byline shall receive: (a) from the Fund A – Uncovered Claims Fund within the Liquidating Trust, all Cash proceeds of Fund A Assets  or, if the Liquidating Trustee determines that it is impractical to liquidate some portion of the Byline Collateral (or Byline decides that it prefers to liquidate such collateral itself), some or all of the Byline Collateral within the Fund A – Uncovered Claims Fund or (b) such other treatment as is agreed to by Byline and the Liquidating Trustee.  The Byline Deficiency Claim, if any, shall be treated as an Allowed Class 4 Claim.

     **3.**     Voting:  Class 2 is impaired.  The Holder of the Class 2 Claim is entitled to vote.

3.    Class 3:  Other Secured Claims

      **1.**    Class 3 consists of Other Secured Claims.

      **2.**    Treatment:  As soon as reasonably practicable after the earlier of the Effective Date or Allowance, Holders of Allowed Other Secured Claims shall either (i) be paid by the Debtors in full, in cash upon the liquidation of their collateral; (b) receive the collateral securing their Other Secured Claim; or (c) receive such other treatment as is agreed to by the Holder of the Class 3 Claim and the Debtors. If the Allowed Claim of a Holder of an Other Secured Claim exceeds the value of the collateral that secures it, such Holder will have a Secured Claim equal to the value of the collateral and an Unsecured Claim for the difference, which deficiency shall be treated as a Class 4 Claim.

      **3.**    Voting:  Class 3 Claims are Unimpaired.  Holders of Class 3 Claims are deemed to accept the Plan and shall not be entitled to vote.

4.    Class 4: General Unsecured Claims

      **1.**    Classification: Class 4 consists of all general, non-Insider Unsecured Claims against the Debtors that do not constitute Covered Claims.

      **2.**    Treatment:  As soon as reasonably practicable after Class 2 Claim have been paid in full from the Fund A – Uncovered Claims Fund within the Liquidating Trust, Holders of Class 4 Claims shall receive a Pro Rata share of the Cash proceeds of remaining Fund A Assets. As the Byline Class 2 Claim is not expected to be paid in full, however, Holders of Class 4 Claims are not expected to receive a recovery under the Plan.

      **3.**    Voting:  Class 4 is deemed to have rejected the Plan and thus will not be entitled to vote to accept or reject the Plan.

5.    Class 5: Covered Claims

      **1.**    Classification:   Class 5 consists of all Covered Claims other than Covered Subrogation Claims.

**2.** Treatment: Holders of Class 5 Claims shall not receive a distribution under the Plan on account of their Covered Claims. However, if the Insurance Settlement is approved, all Holders of Covered Claims shall have their Claims permanently channeled to the Fund B – Covered Claims Fund within the Liquidating Trust, and each Holder of a Covered Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Covered Claim against the Debtors and / or any of the Released Parties: their Pro-Rata share of the Cash proceeds of the Fund B Assets contained within the Fund B – Covered Claims Fund (with Distributions to be made as promptly as practicable following the Trustee completing the Covered Claims Allowance Process and otherwise taking actions necessary and appropriate to allow for Distributions).

**3.** Voting: Class 5 is deemed to have rejected the Plan and thus will not be entitled to vote to accept or reject the Plan.

6. Class 6: Covered Subrogation Claims

**1.** Classification: Class 6 consists of all Covered Subrogation Claims.

**2.** Treatment: Holders of Allowed Covered Subrogation Claims shall have their Claims included in Fund B – Covered Claims Fund within the Liquidating Trust. Each Allowed Covered Subrogation Claim shall be reduced by fifty percent (50%), and then each Holder of an Allowed Covered Subrogation Claim shall be entitled to a Pro Rata share of the Cash proceeds of the Fund B Assets contained within the Fund B – Covered Claims Fund. Distributions to Holders of Class 5 Covered Claims and Holders of Class 6 Covered Subrogation Claims shall occur at the same time. The foregoing treatment represents a compromise solely relating to the division of the Fund B Assets between Classes 5 and 6 under the Plan, the resolution of all issues relating to the subordinated distribution rights of Covered Subrogation Claims under the Plan and the extent to which the Covered Subrogation Claims shall receive distributions of Plan assets, and the resolution of objections to confirmation of the Plan only and has no preclusive or precedential effect on any other matters, or causes of action, including, without limitation, any future allocation in connection with litigation outside of the above-captioned bankruptcy

cases. Holders of all Covered Claims, including Covered Subrogation Claims, agree that this compromise will not be used for any purpose other than resolving objections to confirmation of the Plan. For the avoidance of doubt, the Covered Subrogation Claims shall not be subordinated to any other Covered Claim pursuant to § 509 or any other applicable law.

**3.** Voting: Class 6 is deemed to have rejected the Plan and thus will not be entitled to vote to accept or reject the Plan.

7. Class 7: Subordinated Governmental Claims

**1.** Classification: Class 7 consists of the FERC Claim and the EGLE Administrative Claim.

**2.** Treatment: Each Holder of an Allowed Class 7 Claim shall receive its Pro-Rata share of any and all Cash Proceeds of Fund A Assets from the Fund A – Uncovered Claims Fund within the Liquidating Trust after all Class 4 Claims have been paid in full. Holders of Class 7 Claims are not expected to receive a recovery under the Plan.

**3.** Voting: Although the Debtors understand that Holders of Class 7 Claims have consented to their treatment, Class 7 is deemed to have rejected the Plan and thus will not be entitled to vote to accept or reject the Plan.

8. Class 8: Equity Interests:

**1.** Classification: Class 8 consists of Equity Interests.

**2.** Treatment: The Debtors do not expect that there will be any funds available for Class 8. In the event that there are, the following will determine how those proceeds are allocated: (a) if the Independent FERC Investigative Report determines that the Dam Breaches did not substantially result (less than 33.33%) from negligence by the Debtors and / or their affiliates, any remaining proceeds available in the Fund A – Uncovered Claims Funds after creditors in Class 7 have been paid in full or otherwise satisfied shall be distributed Pro-Rata to Equity Holders or (b) if the Independent FERC Investigative Report determines that the Dam Breaches substantially resulted (greater than 66.66%), in whole or in part, from negligence by the Debtors and / or their affiliates, any remaining

proceeds available in the Fund A – Uncovered Claims Funs after creditors in Class 7 have been paid in full or otherwise satisfied shall be distributed to the Fund B – Covered Claims Fund. If there is any uncertainty regarding the foregoing, the Liquidating Trustee may file a motion (Equity Holders agree that an adversary proceeding shall not be required notwithstanding anything to the contrary in the Bankruptcy Code) the Bankruptcy Court to assess the report and make a determination concerning whether the Independent FERC Investigative Report attributed any negligence to the Debtors and / or their affiliates.

   **3.**  Voting: Class 8 is deemed to have rejected the Plan and thus will not be entitled to vote to accept or reject the Plan.

**ARTICLE V.**
**ALLOWANCE OF CLAIMS AND TREATMENT OF DISPUTED CLAIMS**

  A.  **Special Treatment for Covered Claims**

   1.  If the Insurance Settlement is approved, then notwithstanding anything to the contrary herein, the failure of a Holder of a Covered Claim to submit a proof of claim by the Bar Date will not preclude it from receiving a recovery under the Plan. Rather, if the Insurance Settlement is approved, post-Confirmation the Liquidating Trustee will conduct the Covered Claims Allowance Process, which process will determine which Covered Claims will share in the Fund B Assets contained within the Fund B – Covered Claims Fund.

   2.  If the Insurance Settlement is approved the fees and expenses of Stretto in performing the Stretto Claims Reconciliation Work shall be deemed part of the Covered Claims Allowance Process and shall be paid as Liquidating Trust Expenses. Per agreement with Stretto, $75,000 of the pre-confirmation Stretto fees (estimated fees for claims reconciliation work and a small portion of the Insurance Settlement related fees) are being deferred and will be paid by the Liquidating Trustee from Fund B as expeditiously as possible following the Effective Date.

  B.  **Objections to Claims; Prosecution of Disputed Claims**

   1.  After the Effective Date, the Liquidating Trustee may object (and shall take over, and continue prosecuting, any outstanding claims objections initiated by the Debtors) to the allowance of any Claims, including, without limitation, Unsecured Claims, Covered Claims asserted as part of the Covered Claims Allowance Process (if applicable), and to the Administrative Claims of Professionals

if asserted against the Liquidating Trust, all as the Liquidating Trustee determines in his reasonable business judgment. The Liquidating Trustee may litigate or settle such objections in its discretion, and no Bankruptcy Court approval shall be required in order for the Liquidating Trustee to settle and/or compromise any Claim, objection to Claim, Cause of Action, or right to payment. The Liquidating Trustee shall have sole and complete discretion to not review and/or object to Claims, including, without limitation, to not object to Claims below a certain dollar amount to the extent it determines that such review and/or objection would be uneconomical.

## C.    **Estimation of Claims**

The Liquidating Trustee may at any time request that the Bankruptcy Court estimate any contingent or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Liquidating Trustee previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or Disputed Claim, the amount so estimated shall constitute the maximum allowable amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court, and the Liquidating Trustee shall have the right to seek approval from the Bankruptcy Court to establish a procedure outside of the Bankruptcy Court for estimating claims if the Liquidating Trustee determines that such a process might be beneficial as part of the Covered Claims Allowance Process or otherwise.

## D.    **No Partial Distributions on Disputed Claims**

No distribution shall be made with respect to all or any portion of any Claim, a portion of which or all of which is a Disputed Claim, pending the entire resolution thereof. In the event of interim distributions, the Liquidating Trustee shall be authorized to decide whether to escrow funds in his business judgment to account for Disputed Claims, and may also ask the Bankruptcy Court to estimate Disputed Claims or to determine the necessity of an escrow.

### E. Enforcement of Bar Date

Subject to the provisions of this Plan for Covered Claims in the event the Insurance Settlement is approved, any Entity that fails to File a proof of Claim or request for allowance or payment of an Administrative Claims by the applicable Bar Dates and was not otherwise permitted to File a proof of Claim after the applicable Bar Dates by a Final Order of the Bankruptcy Court is and shall be barred, estopped and enjoined from asserting any Claim against the Liquidating Trust (i) in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such Entity as undisputed, noncontingent, and liquidated; or (ii) of a different nature or a different classification than any Claim identified in the Schedules on behalf of such Entity. All Claims Filed after the applicable Bar Dates and for which no Final Order has been entered by the Bankruptcy Court determining that such Claims were timely Filed shall be disallowed and expunged.

## ARTICLE VI.
## DISTRIBUTIONS

### A. Timing and Effective Date of Distributions

The Liquidating Trustee shall make Distributions as provided for herein and shall use reasonable efforts to make Distributions under the Plan as soon as reasonably practicable following the Effective Date (subject to needing to complete practical requirements such as objecting to or estimating Disputed Claims, or completing the Covered Claims Allowance Process if the Insurance Settlement is approved). Distributions made to Holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

### B. Method of Distributions to Holders of Claims

Distributions made pursuant to the Plan, shall be in U.S. dollars and, at the option and in the sole discretion of the Liquidating Trustee, may be made by (a) checks drawn on or (b) wire transfers from a domestic bank selected by the Liquidating Trustee.

### C. Delivery of Distributions

Subject to the provisions of Rule 2002(g) of the Bankruptcy Rules, and except as otherwise provided herein, distributions and deliveries to Holders of Allowed Claims shall be made at the Distribution Address of each Holder.

## D.  Tax Identification Numbers and OFAC Certifications

Notwithstanding anything in the Plan to the contrary, prior to the Liquidating Trust making Distributions hereunder, the Liquidating Trust may require each Holder to furnish: (a) its Employer or Taxpayer Identification Number as assigned by the Internal Revenue Service on a Form W-9 and (b) a certification that the Holder is not a person or entity with whom it is illegal for a U.S. person to do business under Office of Foreign Assets Control ("*OFAC*") sanctions regulations and/or the list of Specially Designated Nationals and Blocked Persons (collectively, the "*Pre-Distribution Certifications*"). The Liquidating Trust will mail Pre-Distribution Certification forms to the Distribution Address for each Holder prior to Distributions being made, and Holders shall have forty-five (45) days from the date of mailing to return the executed Pre-Distribution Certifications. Any Holder that fails to return the executed Pre-Distribution Certifications within such forty-five (45) day period shall be deemed to have forfeited its right to receive Distributions and shall be forever barred and enjoined from asserting any right to Distributions made prior to the Liquidating Trustee receiving its executed Pre-Distribution Certifications (such a Holder would only be entitled to a Pro-Rata Share of remaining future Distributions, if any). Any Distributions that are forfeited pursuant to this provision will be returned to the particular Fund within the Liquidating Trust from which the Distribution was made.

## E.  Undeliverable Distributions

### 1.  Holding of Undeliverable Distributions

If any Distribution to any Holder of an Allowed Claim is returned to the Liquidating Trust as undeliverable, no further Distributions shall be made to such Holder unless and until the Liquidating Trustee is notified by such Holder, in writing, of such Holder's then-current address. Upon such an occurrence, the appropriate Distribution shall be made as soon as reasonably practicable after such Distribution has become deliverable. All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan shall require the Liquidating Trustee to attempt to locate any Holder of an Allowed Claim.

### 2.  Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim entitled to an undeliverable or unclaimed Distribution that does not provide notice of such Holder's correct address to the Liquidating Trustee within ninety (90) days after the date of the initial Distribution

made by the Liquidating Trustee to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed Distribution against the Liquidating Trust. If, after ninety days, Distributions remain unclaimed, unclaimed Distributions will become Forfeited Distributions and such amounts shall revert to and become the property of the Fund within Liquidating Trust from which the Distribution was made.

In the event that the aggregate amount of the Forfeited Distributions is less than $10,000.00 in either Fund and there is not a realistic prospect of receiving additional Cash or other assets, and/or the Liquidating Trustee otherwise determines, in his reasonable business judgment, that a further Distribution would not be economically justifiable (for example, a Distribution would result in *de-minimis* payments after costs) and that the remaining funds are not otherwise needed (*e.g.*, for winding up the Liquidating Trust), the remaining Forfeited Distributions may be donated to a 501(c)(3) charitable organization benefitting residents in Midland and/or Gladwin Counties (in the Liquidating Trustee's reasonable discretion).

## F.     **Withholding and Reporting Requirements**

In connection with the Plan and all Distributions thereunder, the Liquidating Trustee shall comply with all tax withholding and reporting requirements imposed by any U.S. federal, state or local or non-U.S. taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution, and (b) the Liquidating Trustee and Debtors, as applicable, reserve the option, in their discretion, to not make a Distribution to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee for the payment and satisfaction of such tax obligations or has, to the satisfaction of the Liquidating Trustee established an exemption therefrom. The Liquidating Trustee can withhold Distributions until necessary information is received to confirm compliance with applicable withholding and reporting requirements.

### G. Time Bar to Cash Payments

Checks issued by the Liquidating Trustee on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days from and after the date of issuance thereof. Requests for reissuance of any check that has become null and void shall be made directly to the party that issued the check (the Liquidating Trustee as the case may be) by the Holder of the Allowed Claim within thirty (30) days of the check becoming null and void. After such thirty (30) day period has elapsed, all claims relating to such voided checks shall be discharged and forever barred. In the case of checks issued on account of Allowed Claims but not negotiated within one hundred and twenty (120) days of issuance and for which no request for reissuance is made before thirty (30) days after issuance, the amounts at issue shall be deemed to be Forfeited Distributions. Any creditor or claimant that fails to negotiate its check and seek reissuance as provided for above shall not be entitled to any further distributions on any Claim, regardless of Class.

### H. Interest

Unless otherwise required by applicable bankruptcy law, or specifically provided for herein, post-petition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest or fees accruing on or after the Petition Date on any Claim. No interest shall be paid on Disputed Claims that later become Allowed Claims.

In accordance with Section 502(b)(2) of the Bankruptcy Code, the amount of all prepetition Unsecured Claims against the Debtors shall be calculated as of the Petition Date. Except as otherwise explicitly provided in the Plan, in Section 506(b) of the Bankruptcy Code, or by Final Order, no Holder of a prepetition Claim shall be entitled to or receive interest or fees relating to such Claim.

### I. Fractional Dollars; De Minimis Distributions

Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. The Liquidating Trustee will not make any Distribution of less than twenty five dollars ($25.00) under any circumstance on account of any Allowed Claim, and shall not make any distribution under one hundred dollars ($100.00) on account of any Allowed Claim unless a specific request therefor is made in writing to the Liquidating Trustee on or before sixty (60) days after the Effective Date.

### J.    Set-Offs

Consistent with applicable law, the Liquidating Trustee may, but shall not be required to, set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Debtors, their Estates, or the Liquidating Trust may hold against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a set off nor the allowance of any claim hereunder shall constitute a waiver or release by the Debtors, their Estates, or the Liquidating Trustee of any such claims, rights, and Causes of Action that the Debtors, their Estates, the Liquidating Trust, or the Liquidating Trustee may possess against such Holder.

### K.    Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims or controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim with respect thereto, or any distribution to be made on account of such an Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims or controversies, and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims, and is fair, equitable and reasonable.

## ARTICLE VII.
## IMPLEMENTATION OF THE PLAN

### A.    Approval of Insurance Settlement

As noted at the outset of this Plan, the Insurance Settlement Approval Order being entered is a condition precedent to Confirmation of the Plan as drafted.

### B.    Substantive Consolidation

The Plan shall serve as a motion by the Debtors seeking entry of an order by the Bankruptcy Court substantively consolidating the Estates into a single consolidated estate for all purposes associated with Confirmation and Consummation of the Plan, including but not limited to voting and distribution.  If substantive consolidation of all of the Estates is ordered then, on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as merged into

the Estate of BH for all purposes associated with Confirmation and Consummation of the Plan. Substantive consolidation shall not affect the legal and organizational structure of the Debtors or their separate corporate existences and will not impair the validity of any contracts or leases assumed or entered into during the Chapter 11 Cases. Any alleged defaults under any agreement with the Debtors arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

The Plan shall also serve as a motion by the Debtors seeking entry of an order by the Bankruptcy Court approving the Non-Debtor Substantive Consolidation and substantively consolidating the assets and liabilities of BM, the Boyce Trusts, and Smallwood Properties into the consolidated Estate of BH for all purposes associated with Confirmation and Consummation of the Plan, including but not limited to voting and distribution. If the Non-Debtor Substantive Consolidation is ordered then, on and after the Effective Date, all assets and liabilities of BM, the Boyce Trusts, and Smallwood Properties shall be treated as merged into the consolidated Estate of BH for all purposes associated with Confirmation and Consummation of the Plan. All claims between and among the Debtors and the entities subject to the Non-Debtor Substantive Consolidation shall be deemed waived, and all claims shall be asserted as claims against the consolidated Estate of BH. Substantive consolidation shall not affect the legal and organizational structure of entities subject to the Non-Debtor Substantive Consolidation or their separate corporate existences. Any alleged defaults under any agreement with the entities subject to the Non-Debtor Substantive Consolidation arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date. The Liquidating Trustee shall have the corporate authority to act for or direct the actions of BM, the Boyce Trusts, and Smallwood Properties from and after the Effective Date, and shall do so in a commercially reasonable manner in his business judgment, but shall not have any fiduciary responsibility to the beneficiaries of the Boyce Trusts.

Any and all Claims and obligations of any of the entities whose assets and liabilities are substantively consolidated hereunder against the other consolidated entities shall be eliminated and canceled. Any joint and several liability of any of the entities whose assets and liabilities are substantively consolidated hereunder shall be treated as one collective obligation of the consolidated Estate of BH.

All assets transferred to the Liquidating Trust hereunder shall be deemed transferred by BH following both the substantive consolidation of the Debtors' estates and the Non-Debtor Substantive Consolidation of the assets and liabilities of

BM, the Boyce Trusts, and Smallwood Properties into the consolidated Estate of BH.

### C. Establishment of Liquidating Trust

The Liquidating Trust shall be established as of the Effective Date for the benefit of Liquidating Trust Beneficiaries.

### D. Funding of the Liquidating Trust's Expenses

All Liquidating Trust Expenses shall be funded fromthe Fund B Assets within the Fund B – Covered Claims Fund other than as specifically provided in the Byline-Covered Claim Settlement.

### E. Vesting of the Debtors' Assets in the Liquidating Trust

On the Effective Date, all of the Debtors' tangible and intangible assets, including, without limitation, all right title and interest in and to all Causes of Action, including the proceeds thereof, as well as the assets of the entities subject to the Non-Debtor Substantive Consolidation, shall be transferred to and vest in the Liquidating Trust, and shall be deemed allocated to the Fund A – Uncovered Claims Fund or the Fund B – Covered Claims Fund as provided under and subject to the terms of the Plan. . All rights of the Liquidating Trust under the Plan, the Confirmation Order, and the Liquidating Trust Agreement, and copies of all books and records related to the Debtors or their Estates and the entities subject to the Non-Debtor Substantive Consolidation, shall be transferred to and vest in the Liquidating Trust and be deemed contributed thereto for the equal benefit of both Funds within the Liquidating Trust, subject to the terms of the Plan. The entry of the Confirmation Order shall automatically be deemed to authorize and direct the Debtors to take such steps as may be necessary or appropriate to effectuate such transfers and contributions of property to the Liquidating Trust.

### F. Vesting of the HoldCo Assets and/or HoldCo Equity Interests in the Liquidating Trust

Upon the occurrence of (a) the Effective Date and (b) the Liquidating Trustee providing written notice pursuant to the Assignment Agreement, the HoldCo Assets and / or the HoldCo Equity Interests (as determined by the Liquidating Trustee in its discretion) shall be transferred to and vest in the Fund A – Uncovered Claims Fund within the Liquidating Trust and be deemed contributed thereto, subject to the terms of the Plan and Assignment Agreement. The entry of the Confirmation Order shall automatically be deemed to authorize and direct the parties to the Assignment

Agreement to take such steps as may be necessary or appropriate to effectuate the transfer and contribution of property contemplated by the Assignment Agreement.

### G. Administration of Liquidating Trust

The Liquidating Trust will be governed by, and the Liquidating Trustee shall administer the Liquidating Trust in accordance with, the Liquidating Trust Agreement and the Plan. The Liquidating Trustee shall have the powers set forth herein and in the Liquidating Trust Agreement, which powers shall include, without limitation, the right to: operate, sell, settle, or otherwise dispose of or liquidate the Liquidating Trust Assets; object to or continue objecting to, or to seek to estimate Claims to the extent provided for hereunder; pursue and/or resolve Causes of Action; make Distributions to Liquidating Trust Beneficiaries; accept additional assets or contributions; otherwise exercise such other powers as are customary for a liquidating trustee of this nature and reasonably calculated to carry out the objectives of the Plan.

The Liquidating Trustee, upon the Effective Date, may retain on behalf of the Liquidating Trust such law firms, accounting firms, experts, advisors, consultants, investigators, appraisers, auctioneers, brokers, or other professionals as the Liquidating Trustee may deem necessary, in its sole discretion, in accordance with the terms of the Liquidating Trust Agreement.

### H. Temporary Continued Existence of Debtors

On and after the Effective Date the Debtors will continue to exist, but their assets will have been consolidated and transferred to the Liquidating Trust as provided for herein. The Liquidating Trustee shall be tasked with winding them down as efficiently and expeditiously as possible (including, without limitation, retaining and paying an accountant to complete final tax returns as appropriate / needed). Lee Mueller, the Authorized Representative for the Debtors in the Chapter 11 Cases, shall reasonably cooperate with and assist the Liquidating Trustee and its professionals to accomplish the foregoing and to assist the Liquidating Trustee in his fiduciary duties in the sole discretion and upon request of the Liquidating Trustee. Notwithstanding the foregoing or anything to the contrary herein, however, nothing in this Plan shall require Mr. Mueller to spend more than ten (10) hours of time in the aggregate on Liquidating Trust matters.

### I. Dissolution of Debtors

When the Liquidating Trustee determines as necessary or appropriate under the circumstances (including with respect to the pursuit of causes of action in the name of the Estate, and the preservation of rights under the Insurance Policies), the Debtors shall be dissolved without any further action by the stockholders, officers, or directors of the Debtors. The Liquidating Trustee may, in its discretion, file all necessary certificates of dissolution and take any other actions necessary or appropriate to reflect the dissolution of the Debtors under Michigan state law, where the Debtors are incorporated. All applicable regulatory or governmental agencies shall accept any certificates of dissolution or other papers filed by the Liquidating Trustee on behalf of the Debtors and shall take all steps necessary to allow and reflect the prompt dissolution of the Debtors as provided in the Plan, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates, except as the Liquidating Trustee may determine in its sole discretion.

### J. Wind-Up of Entities Subject to Non-Debtor Substantive Consolidation

At an appropriate time (in the Liquidating Trustee's discretion), the Liquidating Trustee will take appropriate steps to responsibly wind-up the Contributing Parties in accordance with applicable state and federal law (including with respect to arranging for final tax returns to be filed, if needed) and the underlying corporate documents for such entities. With respect to the Trusts, the Liquidating Trustee will consult with (but will not be directed by) the current Co-Trustees in connection with same. Lee Mueller agrees to reasonably cooperate, including providing any available information, to facilitate the Liquidating Trustee's efforts to wind-up the Contributing Parties and to assist the Liquidating Trustee in his fiduciary duties in the sole discretion and upon request of the Liquidating Trustee. Notwithstanding the foregoing or anything to the contrary herein, however, nothing in this Plan shall require Mr. Mueller to spend more than ten (10) hours of time in the aggregate on Liquidating Trust matters.

### K. Corporate Action

Upon the occurrence of the Effective Date, the Debtors and Liquidating Trustee are authorized, without the need for any or further order of the Bankruptcy Court, to take any and all actions reasonably necessary to effectuate the Plan.

Upon the Effective Date, the authority, power, and incumbency of the persons then acting as co-managing members or authorized representatives of the Debtors

shall be terminated and such parties shall be deemed to have resigned, and any remaining managers and employees of the Debtors as of the Effective Date shall automatically cease to be managers and employees. On and after the Effective Date the Liquidating Trustee shall have sole authority over, and shall be authorized to act on behalf of, the Debtors, and shall serve as the Debtors' authorized representative in all regards (and will succeed to such powers as would have been applicable to the Debtors' managers, members, and authorized representatives prior to the Effective Date).

### L. Preservation of Rights

On the Effective Date, the Liquidating Trust, shall be assigned all rights of the Debtors and all entities subject to the Non-Debtor Substantive Consolidation to commence and pursue any and all Causes of Action (under any theory of law, including, without limitation, the Bankruptcy Code, and in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Debtors' Chapter 11 Cases) other than any Causes of Action against the Released Parties. Notwithstanding the foregoing, the Liquidating Trust may not pursue any Avoidance Action or any Cause of Action, whether for a Covered Claim or otherwise, against any of the Insurance Settlement Released Parties. In addition, assuming the Liquidating Trustee effectuates the HoldCo Assignment Agreement, the Liquidating Trust, on behalf of the Fund A – Uncovered Claim Fund, shall either take direct assignment of all claims and causes of action that constitute HoldCo Assets, or shall control such claims and causes of action through the Liquidating Trust's ownership of the HoldCo Equity Interests.

Unless expressly and specifically released in connection with the Plan, the Confirmation Order, or in any settlement agreement approved during the Chapter 11 Cases, all of the Debtors' rights, Claims, Causes of Action, defenses, and counterclaims shall become assets of and vest with the Liquidating Trust, and the Liquidating Trustee shall not waive, relinquish, or abandon (nor shall it be estopped or otherwise precluded from asserting) any such rights, Claims, Causes of Action, defenses, or counterclaims, regardless of whether or not: (a) litigation relating thereto is pending on the Effective Date; (b) such rights, Claims, Causes of Action, defenses, or counterclaims have been listed or referred to in the Plan or the Schedules, or any other document filed with the Bankruptcy Court, (c) such rights, Claims, Causes of Action, defenses, or counterclaims are currently known to the Debtors, and (d) a defendant in any litigation relating to such rights, Claims, causes of action, defenses or counterclaims filed a proof of Claim in the Chapter 11 Cases, filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases,

voted for or against the Plan, or received or retained any consideration under the Plan. Without in any manner limiting the generality of the foregoing preservation of rights, notwithstanding any otherwise applicable principal of law or equity, including, without limitation, any principals of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, Claim, Cause of Action, defense, or counterclaim, or potential right, Claim, cause of action, defense, or counterclaim, in the Plan, the Schedules, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Liquidating Trustee's right to commence, prosecute, defend against, settle, and realize upon any rights, Claims, causes of action, defenses, or counterclaims that become assets of and vest with Liquidating Trustee as of the Effective Date. The Liquidating Trustee may commence, prosecute, defend against, settle, and realize upon any rights, Claims, causes of action, defenses, and counterclaims in his discretion, in Bankruptcy Court or in other forums, in accordance with the Liquidating Trust Agreement and what is in the best interests, and for the benefit, of Liquidating Trust Beneficiaries.

Without in any way limiting the generality of the foregoing, the Debtors believe that they have claims and causes of action arising from the Dam Breaches against all parties to the Lake Level Order. The Debtors also have claims against various departments of the State of Michigan relating to the Dam Breaches.

Notwithstanding anything in the Plan, Confirmation Order, or Liquidating Trust Agreement to the contrary, the Liquidating Trustee shall not have the right to pursue avoidance of or seek to claw back or recover, whether as a fraudulent transfer or otherwise, any of the following disclosed distributions made by the Boyce Trusts to beneficiaries: (a) $150,000 in total distributions in 2016; (b) $150,000 in total distributions in 2014.

Notwithstanding anything in the Plan, Confirmation Order, or Liquidating Trust Agreement to the contrary, the settlement of the Chapter 11 Bankruptcy Estates pursuant to the Plan shall not be deemed an admission of culpability by any party with respect to the Dam Breaches.

## M. Cancellation of Notes, Instruments, and Debentures

On the Effective Date, except to the extent provided otherwise in the Plan, all notes, instruments, debentures, certificates, and other documents evidencing Claims against the Debtors shall be deemed canceled, terminated, and surrendered (regardless of whether such notes, instruments, debentures, certificates or other documents are in fact surrendered for cancellation to the appropriate indenture

trustee or other such Person). On the Effective Date, any indentures to which the Debtors are a party shall be deemed canceled as permitted by section 1123(a)(5) of the Bankruptcy Code. All Claims against the Debtors shall be treated as provided hereunder, with Creditors entitled to distributions from particular Funds within the Liquidating Trust as provided for herein.

### N.     Abandonment and Termination of Licenses and Permits

On the Effective Date of the Plan, all licenses and permits held by the Debtors, with the exception of the FERC Licenses, shall be deemed abandoned and terminated, and shall not constitute Liquidating Trust Assets or otherwise transfer to the Liquidating Trust. Notwithstanding anything to the contrary herein, the FERC Licenses will not transfer to the Liquidating Trust. BHP has requested that If the Commission determines that it must take some affirmative action in order to terminate the FERC Licenses, the Commission should find that the Condemnation Actions and loss of the project property resulted in the constructive abandonment and implied surrender of the Boyce Project licenses. The Debtors may file a more formal request along those lines if needed.

### O.     Insurance Preservation

Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any policies of insurance that may cover any claims against the Debtors or any other Entity.

### P.     Non-Interference with Liquidating Trustees Efforts

No person shall interfere with the Liquidating Trustee's efforts to carry out his duties hereunder (Filed objections to actions taken shall not be deemed to be interference). The Bankruptcy Court shall retain jurisdiction to entertain a motion by the Liquidating Trustee to address any such interference and to fashion an appropriate remedy or remedies.

### Q.     Transfer of Unpursued ("Abandoned") Claims

If the Liquidating Trustee has not sold, settled, or filed a legal proceeding to pursue the HoldCo Causes of Action and/or the Mussel Death Claims within 14 months of the occurrence of the Effective Date (any such unpursued claim(s), an "*Unpursued Claim*"), the Liquidating Trustee, upon written request of the Trustees of the Boyce Trusts, shall transfer such claims to an entity to be established by the Trustees for the benefit of the Beneficiaries of the Boyce Trusts. The Liquidating Trustee shall have the right to seek an extension of the foregoing period for cause,

provided, however, that any extension for any HoldCo Causes of Action and/or the Mussel Death Claims shall end, at the latest, six months prior to the expiration of the applicable statute of limitations for such claim. The Liquidating Trustee may also agree to an earlier transfer in his business judgment. Any Unpursued Claim the Boyce Trustees request in writing, in accordance with the provisions of this paragraph, be transferred to an entity for the benefit of the Boyce Trusts Beneficiaries shall be deemed as "abandoned" by the Liquidating Trustee within the meaning of 11 U.S. Code § 554.

For the avoidance of doubt, the Liquidating Trustee shall have the right to settle and / or sell and assign Causes of Action and / or other assets subject to the provisions hereof and the Liquidating Trust Agreement, including, without limitation, the HoldCo Causes of Action and / or the Mussel Death Claims. In the event that the Trustee reaches agreement to sell or settle any or all of the HoldCo Causes of Action and / or the Mussel Death Claims, the Trustee shall provide the Trustees of the Boyce Trusts not less than thirty (30) days notice of such agreement and an opportunity to present a higher and better proposal.

# ARTICLE VIII.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Presumed Rejection

Any executory contracts or unexpired leases contained in the Schedule of Executory Contracts and Unexpired Leases which have not (i) expired by their own terms on or prior to the Effective Date, or (ii) been assumed, assumed and assigned, or rejected with the approval of the Bankruptcy Court, shall be deemed rejected by the Debtors as of the Effective Date.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejection of such executory contracts and unexpired leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code as provided for above.

### B.    Rejection Damages Claims

Except as otherwise provided in a Final Order approving the rejection of an executory contract or unexpired lease, Claims arising out of the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Rejection Claims Bar Date. Any Claims not Filed by the Rejection Claims Bar Date will be forever barred from receiving a distribution from the Debtors and/or the Liquidating Trust.

The Liquidating Trust reserves the right to object to, settle, compromise or otherwise resolve any Claim filed on account of a rejected executory contract or unexpired lease in the same manner as discussed hereunder for other Claims.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND THE EFFECTIVE DATE

### A.   Acceptance or Rejection of the Plan

1.   Acceptance by Impaired Classes

An Impaired Class of Claims will have accepted the Plan if the Holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class actually voting have voted to accept the Plan, in each case not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code.

2.   Elimination of Classes

Any Class that does not contain any Allowed Claims or Equity Interests or any Claims or Equity Interests temporarily allowed for voting purposes under Federal Rule of Bankruptcy Procedure 3018, as of the date of the commencement of the Confirmation Hearing, will be deemed not included in the Plan for purposes of (i) voting to accept or reject the Plan and (ii) determining whether such Class has accepted or rejected the Plan.

3.   Nonconsensual Confirmation

Pursuant to section 1191(b) of the Bankruptcy Code, Bankruptcy Court may confirm the Plan over the dissent of any Impaired Class if all of the requirements for consensual confirmation under section 1129(a) of the Bankruptcy Code have been met other than subparagraphs (8), (10), and (15) and if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. The Debtors reserve the right to modify the Plan in accordance with section 1193 of the Bankruptcy Code.

4. Approval or Denial of the Insurance Settlement

The Insurance Settlement having been approved or denied by a Final Order of the Bankruptcy Court or withdrawn or otherwise resolved.

## B. **Conditions Precedent to Confirmation Date of the Plan**

The occurrence of the Confirmation Date shall be subject to satisfaction of the following conditions precedent:

1. The entry of the Confirmation Order in form and substance satisfactory to the Debtors;

2. The Insurance Settlement Resolution Date having occurred; and

3. The Debtors being authorized to take all actions necessary or appropriate to enter into, implement, and consummate the Plan and other agreements or documents created in connection with the Plan.

## C. **Conditions Precedent to the Effective Date of the Plan**

The occurrence of the Effective Date and the Consummation of the Plan are subject to satisfaction of the following conditions precedent:

1. The Confirmation Date shall have occurred.

2. The Debtors shall have completed all transactions and executed all documents required to occur on the Effective Date hereunder.

3. The Debtors, within three Business Days of the Effective Date, shall file a Notice of Effective Date, which shall be Filed with the Court and served only on creditors who have signed up to receive notice via the CM/ECF system.

## D. **The Confirmation Order**

If the Confirmation Order is vacated for whatever reason, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (ii) prejudice in any manner the rights of the Debtors; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtors.

## ARTICLE X.
## EFFECT OF PLAN CONFIRMATION

### A.     Discharge of Claims

The Debtors will not receive a discharge under the Plan in accordance with section 1141 of the Bankruptcy Code.

### B.     Termination of Subordination Rights and Settlement of Related Claims

The classification and manner of satisfying all Claims and Equity Interests and the respective distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan. The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Entities from enforcing or attempting to enforce any such contractual, legal, and equitable subordination rights satisfied, compromised, and settled in this manner.

### C.     Injunction

1.     Except as otherwise expressly provided in the Plan, all Entities that receive Distributions under the Plan and that have held, hold, or may hold Claims against or Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from taking any of the following actions against any of the Debtors' Estates, Professionals, or the Liquidating Trustee on account of any Claims or causes of action arising from events prior to the Effective Date: (i) commencing or continuing in any manner any action or other proceeding of any kind; (ii) enforcing, attaching, collecting or recovering by any manner or in any place or means any judgment, award, decree or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; and (iv) asserting any defense or right of setoff, subrogation, or recoupment of any kind against any obligation, debt or liability due to the Debtors.

2.     Except as otherwise provided in the Plan or the Confirmation Order, on and after the Confirmation Date (subject to the occurrence of the Effective Date), all Entities who have held, hold or may hold Liens, Claims, or Interests in or against the Debtors or Interests in the Debtors are, with respect to any such Liens, Claims or

Interests, permanently enjoined from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Liquidating Trust or any of its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the foregoing Liquidating Trust, or any property of any such transferee or successor, (b) enforcing against, levying upon or attaching (including, without limitation, any pre-judgment attachment) the Liquidating Trust, or any property of any such transferee or successor, (c) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, of any judgment, award, decree, claim, or order against the Liquidating Trust, any of its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the foregoing Liquidating Trust, (d) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Liens, Claims or Interests of any kind against or in the Liquidating Trust, any of its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, the foregoing Liquidating Trust, (e) asserting any right of setoff, subordination, or recoupment of any kind, directly or indirectly, against any obligation due the Debtors, its Estate, the Liquidating Trust, any of its property, or any direct or indirect transferee of any property of, or successor in interest to, the foregoing Liquidating Trust, and (f) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of this Plan.

3.      By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim receiving Distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth herein.

D.      **Channeling Injunction and Bar Order for Covered Claims**

1.      **If the Insurance Settlement is approved by the Bankruptcy Court: (i) all Covered Claims shall be and shall be deemed channeled to the Fund B – Covered Claims Fund within the Liquidating Trust, which Fund shall assume any and all liability of the Insurer Parties and the Insurance Settlement Released Parties for such Covered Claims; (ii) all Entities that have held or asserted, hold or assert, or may in the future hold or assert one or more Covered Claims against the Insurer Parties and / or the Insurance Settlement Released Parties (including, without limitation, the Liquidating Trust for the avoidance of doubt) are hereby permanently and forever barred, estopped, stayed, and enjoined from taking any action, directly or indirectly, or commencing or**

continuing any suit, action, or other proceeding on, or asserting, enforcing, or attempting to assert or enforce, any Covered Claim against the Insurer Parties and / or the Insurance Settlement Released Parties, or any of their property or assets, including without limitation, taking any of the actions described in (a)-(e) below; and (iii) all Holders of Covered Claims, including without limitation all Holders of Dam Breach Damages Claims, shall be permanently and forever barred, estopped, stayed, and enjoined from taking any action, directly or indirectly, or commencing or continuing any suit, action, or other proceeding on, or asserting, enforcing, or attempting to assert or enforce, any Covered Claim against the Insurer Parties or the Insurance Settlement Released Parties or any of their property or assets, including without limitation, taking any of the actions described in (a)-(e) below:

(a)     pursuing or seeking to pursue, by any manner or means any Covered Claim against the Insurer Parties or the Insurance Settlement Released Parties;

(b)     continuing or commencing, or seeking to continue or commence, by any manner or means, any action or proceeding of any kind with respect to any Covered Claim against the Insurer Parties or the Insurance Settlement Released Parties, or any of their property or assets;

(c)     enforcing, attaching, collecting or recovering, or seeking to enforce, attach, collect or recover, by any manner or means, any judgment, award, decree, or order with respect to any Covered Claim against the Insurer Parties or the Insurance Settlement Released Parties, or any of their property or assets;

(d)     creating, perfecting or enforcing, or seeking to create, perfect or enforce, by any manner or means, any lien, claim or encumbrance of any kind with respect to any Covered Claim against the Insurer Parties or the Insurance Settlement Released Parties, or any of their property or assets; and

(e)     asserting, implementing or effectuating, or seeking to assert, implement or effectuate, by any manner or means, with respect to any Covered Claim, any right of

setoff, recoupment, indemnification, subrogation or other similar right of any kind, against:

(1)     the Insurer Parties or the Insurance Settlement Released Parties;

(2)     any obligation due to any of the Insurer Parties or the Insurance Settlement Released Parties; or

(3)     the property or assets of the Insurer Parties or the Insurance Settlement Released Parties.

If the Insurance Settlement is approved, the Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. In the event of a violation of the Channeling Injunction, the Debtors, the Liquidating Trustee, the Insurer Parties, and the Insurance Settlement Released Parties, as applicable, may seek an order from the Bankruptcy Court enforcing the Channeling Injunction and enjoining such violation and, in connection therewith, may seek an award of costs (including reasonable attorneys' fees and expenses) against the Entity who is found to have violated the Channeling Injunction, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

For the sake of clarity, no release given to or injunction or bar order benefitting any Insurance Settlement Released Party hereunder shall be deemed to release or benefit any party other than the specific Insurance Settlement Released Party at issue. Without limiting the generality of the foregoing, no release, injunction, bar order, or other provision hereof releasing or benefitting any Insurance Settlement Released Party hereunder shall be deemed to release or benefit any employer, employee, agent, entity represented by, family member, insider, or affiliate of such Insurance Settlement Released Party.

E.     Specific Release Language for Insurer Parties

If the Insurance Settlement is approved and the Insurer Parties make Insurer Payments, the following protections shall apply to the Insurer Parties:

The Insurer Payments shall be in full and final exhaustion of the Policy Limits and shall extinguish each Insurer Party's obligations under the Insurance Policies, and such payments shall be deemed to be made in good faith. The

Insurer Payments shall be the only payments the Insurer Parties are obligated to make under the Insurance Settlement Agreement and Plan and shall be the sole obligations the Insurer Parties will have on account of any and all claims of any kind made under or related to the Insurance Policies arising from the Dam Breaches or otherwise and the consideration the Insurer Parties are providing is deemed equal to or greater than the fair value of the Debtors' interests in the Insurance Policies. Under no circumstance will the Insurer Parties ever be obligated to make any additional payments to the Debtors or the Estates or any other Person or Entity under the Insurance Policies; (ii) all limits of liability of the Insurance Policies, including all per occurrence and aggregate limits, are and shall be deemed to be fully and properly exhausted; and (iii) all obligations of the Insurers under the Insurance Policies, including to defend the Insured Parties, are and shall be deemed to be extinguished.

The Debtors, on behalf of themselves and their Estates, and each of the Released Parties shall be deemed to fully, finally, and completely remise, release, acquit and forever discharge the Insurers from any and all claims, whether actual or alleged, known or unknown, accrued or unaccrued, existing or potential, or suspected or unsuspected relating to the Insurance Policies and including, but not limited to, any and all Claims for coverage under the Insurance Policies arising out of or relating to or in any way involving the Dam Breaches (whether for wrongful death, personal injury, emotional distress, property damage, economic loss, environmental damage, remediation or exposure, or any other form of loss, expense, or other benefit covered or potentially covered under the Insurance Policies). In addition, the Debtors, on behalf of themselves and their Estates, and each of the other Released Parties, shall be deemed to withdraw any and all requests, demands, or tenders for defense or indemnity previously submitted to the Insurers under the Insurance Policies arising out of or relating to or in any way involving the Dam Breaches, and further surrender, relinquish, and release any further right to tender or present any Covered Claims whatsoever to the Insurers under the Insurance Policies. The Insurers shall have no duty to defend or indemnify the Debtors, on behalf of themselves and the Estates, or any of the other Insured Parties under the Insurance Policies with respect to any past, present, or future Claim, nor shall the Insurers have any other duty or obligation whatsoever to any other Person or entity with respect to any and all Covered Claims. The Released Parties shall be deemed to expressly waive any and all rights they may have under any contract, statute, code, regulation, ordinance, or the common law, which may limit or restrict the effect of a general release as to claims released herein and the Approval Orders.

Notwithstanding the foregoing release language or anything to the contrary in this Plan, the Confirmation Order, the Insurance Settlement Agreement, or any associated document, nothing shall release the Insurers' obligations, if any, relating to the Mussel Death Claims. The Insurance Companies do not waive, and expressly preserve, the right to argue that the Mussel Death Claims are not covered under the Insurance Policies. The Insured Parties (as defined in the Insurance Settlement Agreement) do not waive, and expressly preserve, the right to argue that the Mussel Death Claims are covered under the Insurance Policies.

### F.    Terms of Existing Injunctions or Stays

Unless otherwise provided, all injunctions or stays as to the Debtors provided for in these Chapter 11 Cases pursuant to sections 105, 362, or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until these Chapter 11 Cases have been closed, and the automatic stay shall be deemed to apply equally to all entities whose assets are substantively consolidated hereunder and shall remain in full force and effect until these Chapter 11 Cases have been closed.  The Confirmation Order will permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any Claims, Equity Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to the Plan.

### G.    Exculpation

Subject to section 1125(e) of the Bankruptcy Code, if applicable, neither the Debtors, their Estates, the Subchapter V Trustee, the Liquidating Trust, nor any of their respective present or former advisors, attorneys, or agents acting in such capacity, shall have or incur any liability to, or be subject to any right of action by, the Debtors, their Estates, the Liquidating Trust, or any Holder of a Claim or an Equity Interest, or any other party in interest, or any of their respective agents, shareholders, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, (a) any act taken or omitted to be taken on or after the Petition Date, (b) the Plan and the documents necessary to effectuate the Plan, (c) the solicitation of acceptances and rejections of the Plan, (d) the Insurance Settlement, (e) these Chapter 11 Cases, (f) the administration of the Plan, (g) the distribution of property under the Plan, and (h) any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or these Chapter 11 Cases, and in all respects shall be entitled to rely reasonably upon the advice of

counsel with respect to their duties and responsibilities under the Plan, except for, in each case, acts involving gross negligence or fraud.

## H. Releases

### 1. Releases by the Debtors

For good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and the Estates, including the consolidated Estate of BH (which shall be acting with respect to, without limitation, the HoldCos and the entities subject to the Non-Debtor Substantive Consolidation), shall forever release, waive, and discharge all claims, obligations, suits, judgments, demands, debts, rights, Causes of Action, HoldCo Causes of Action, and liabilities, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date, including, without limiting the breadth of the foregoing, any of the foregoing arising from, or otherwise relating to: (i) any contractual, financial or business relationship existing prior to the Petition Date, including, without limitation, the SBA Loans and the USDA Loans, the extension of any credit in connection therewith, and the administration thereof or the Byline Collateral; (ii) the Plan and the documents necessary to effectuate the Plan; (ii) the solicitation of acceptances and rejections of the Plan; (iii) the Settlement Agreement and/or the Releases; (iv) the Chapter 11 Cases; (v) the property to be distributed under the Plan; or (vi) any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or the Chapter 11 Cases, against (a) the Debtors' Professionals and Authorized Representative (solely in such capacity and as if he were a Professional); (b) the Subchapter V Trustee; and (c) Byline; provided, however, for the sake of clarity, that nothing in this paragraph shall, or shall be construed to, (A) prohibit any party in interest from objecting to the amount of a Professional's allowable fees and expenses so long as the objection does not seek affirmative recovery from, or a setoff against, such Professional's fees based on a claim, obligation, suit, judgment, demand, debt, right, Causes of Action, or liability released by this subsection, or (B) permit any Professional to retain any amount received from the Debtors (whether intentionally or inadvertently) for such Professional's services in excess of the fees and expenses awarded to such Professional by a Final Order of the Bankruptcy Court.

## 2. Releases by Holders of Claims and Interests

As of the Effective Date, all Holders of Allowed Claims and the current and former members, managers, Holders of Equity Interests, and employees of the Debtors (in their capacity as such) shall forever release, waive and discharge all Claims, obligations, suits, judgments, demands, debts, rights, causes of and liabilities (other than the right to enforce the Debtors' obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan, and in the event of gross negligence or fraud), whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to (i) the Debtors; (ii) the parties released pursuant to the Releases; (iii) the Plan, and the documents necessary to effectuate the Plan; (iv) the solicitation of acceptances and rejections of the Plan; (v) the Insurance Settlement and/or the Releases; (vi) the Chapter 11 Cases; (vii) the property to be distributed under the Plan; or (viii) any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or the Chapter 11 Cases, against each of (a) the Debtors' Professionals; (b) the Estates; (c) the Subchapter V Trustee; (d) Byline; and (e) the Liquidating Trust and the Liquidating Trustee, including professionals employed by the Liquidating Trustee and/or Liquidating Trust (in such capacities).

## 3. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document assumed, entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article III of the Plan, all mortgages, deeds of trust, liens, or other security interests against any property shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, shall revert to the Liquidating Trustee.

## I. Limited Exception for Carved-Out Insurance Policy

1. If the Insurance Settlement is approved, the Plan is intended to preserve any rights of Holders of Covered Claims to collect proven and covered liability from the applicable proceeds of the Carved-Out Insurance

Policy. Accordingly, and notwithstanding anything to the contrary in the Plan or in this Article, Holders of Covered Claims may pursue or continue to pursue legal actions in tort against Michele Mueller (the "*Carved-Out Claims*"), subject to the following conditions:

(a) Any award, judgment, interest, cost, or other claim, of any type, entered in regard to or as a result of the "Carved-Out Claims" shall not be collected from Michele Mueller, or any of her personal assets, but shall be collected exclusively from the proceeds of the Carved-Out Insurance Policy.

(b) The Holders of Covered Claims shall bear all costs of pursing liability and coverage for the Carved-Out Claims. The Holders of Covered Claims shall bear all costs of prosecuting the Carved-Out Claims from initial filing of complaints, through discovery, trial, and any appeals resulting therefrom, to the entry of any final judgment. The Holders of Covered Claims shall bear all costs of any coverage action, collections proceedings, or other efforts to collect the proceeds of the Carved-Out Policy.

(c) Upon written request from a Holder of a Covered Claim, Michele Mueller shall tender the defense and indemnity of the Carved-Out Claim to the insurer that issued the Carved-Out Policy. The written request must identify the insurer and Carved-Out Policy to which a tender is to be issued.

(d) Michele Mueller shall not be required to pay any costs of defense toward any of the Carved-Out Claims, nor make any payment to any of the insurers that issued the Carved-Out Policy, nor to appear in or participate in any coverage action with regard to any Carved-Out Policy.

(e) Michele Mueller does not admit liability as to any Carved-Out Claim brought or potentially to be brought against her.

(f) Michele Mueller does not represent, guarantee or warrantee that any of the Carved-Out Claims are viable,

nor does she represent, guarantee, or warrantee that coverage is due to them under the terms and conditions of the Carved-Out Policy. Nothing herein is intended or shall be deemed to alter in any way the rights, duties, obligations, terms, conditions, or provisions of the Carved-Out Insurance Policy.

2. The Releases granted to Michele Mueller are hereby expressly limited as needed to allow for the foregoing (including to allow Michele Mueller to be named as defendants in regard to Carved-Out Claims, and to ensure that the Releases do not impair, modify, or limit the rights Holders of Covered Claims with respect to the Carved-Out Insurance Policy).

3. The Insurer Parties shall have each exhausted the settling policies and shall have used up all of their limits as to claims settled hereunder. They shall therefore have no obligations with respect any of the Carved-Out Claims and shall not be called upon to defend or indemnify any party under the settling Policies. Nothing herein is intended to alter the Release and other protections given to the Insurer Parties under the Plan, and this Section shall not be applicable if the Insurance Settlement is not approved.

## J. Reservation of Rights of the United States and State of Michigan

Notwithstanding any other provision of this Plan or the Insurance Settlement if it is approved, nothing shall release, enjoin, or otherwise bar (a) any police or regulatory action by the United States or the State of Michigan; (b) any action to exercise the power of eminent domain and any related or ancillary power or authority of the United States or the State of Michigan; or (c) any environmental liability to the United States or the State of Michigan that the Debtors, any successors thereto, or any other Person or Entity may have as an owner or operator of real property, in each (a)-(c), that is not a Claim.

## ARTICLE XI.
## MISCELLANEOUS

### A. UST Fees

UST Fees shall be paid either by the Debtors pre-Effective Date or by the Liquidating Trustee if not paid prior to the Effective Date. The Liquidating Trust shall also pay the UST Fees arising from the transfer of the Estates' assets to the

Liquidating Trust in accordance with this Plan, but thereafter the Liquidating Trust will not be responsible for UST Fees with respect to disbursements or Distributions made by the Liquidating Trust (to avoid a situation where the Liquidating Trust would be required to pay duplicative UST Fees on the same assets).

### B.     Section 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under this Plan, may not be taxed under any law imposing a stamp tax or similar tax.

### C.     Business Day

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### D.     Severability

The provisions of this Plan shall not be severable unless such severance is agreed to by the Committee and such severance would constitute a permissible modification of the Plan pursuant to section 1127 of the Bankruptcy Code.

### E.     Further Assurances

The Debtors, the Liquidating Trustee, all Holders of Claims receiving Distributions under the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver agreements or documents and take other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### F.     Notices

All notices, requests, and demands required by the Plan or otherwise, to be effective, shall be in writing, and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered to all of the following, or to such other addresses as Filed with the Bankruptcy Court:

***Debtors' Counsel***

Matthew E. McClintock, Esq.
Dan C. Curth, Esq.

**GOLDSTEIN & McCLINTOCK LLLP**
111 W Washington Street, Suite 1221
Chicago, Illinois 60602
Tel.: (312) 337-7700
Fax: (312) 277-2305
Email: mattm@goldmclaw.com

### G.    Filing of Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### H.    Successors and Assigns

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### I.    Closing of Case

The Chapter 11 Cases shall remain open until such time as the Liquidating Trustee has requested a Final Decree and complied with all relevant statutory provisions of required for entry of a Final Decree.

### J.    Governing Law

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal laws apply, the rights and obligations under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of Michigan, without giving effect to the principles of conflicts of laws.

### K.    Section Headings

The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

### L.    Further Information

Requests for further information regarding the Plan should be directed to counsel for both the Debtors (contact information is listed above).

# ARTICLE XII.
# RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain and have exclusive jurisdiction after the Effective Date over any matter arising under the Bankruptcy Code, arising in or related to these Chapter 11 Cases or the Plan, or that relates to the following, in each case to the greatest extent permitted by applicable law (for the sake of clarity, if the applicable law does not provide for exclusive jurisdiction over a matter, the Bankruptcy Court's jurisdiction will not be exclusive):

1.      to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

2.      to determine any and all motions, adversary proceedings, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Liquidating Trustee after the Effective Date; provided, however, that the Liquidating Trustee shall reserve the right to commence collection actions, actions to recover receivables, and other similar actions in all appropriate jurisdictions;

3.      For the Debtors (or Liquidating Trust on behalf of the Debtors) to request that the Court enter an order in support of the Plan and in furtherance of the objectives of the Liquidating Trust deeming or causing the FERC Licenses to be abandoned or terminated if the FERC licenses are not separately resolved as referenced above;

4.      To enforce the releases and injunctions contained in the Plan, including, without limitation, by motion brought by the Insurer Parties or one or more Insurance Settlement Released Party (all of whom shall be deemed to have standing to bring motions to enforce the channeling injunction and releases provided for herein for their benefit);

5.      to hear and determine any timely objections to Administrative Expense Claims and Priority Claims or to proofs of Claim and Equity Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Equity Interest, and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any Claim, in whole or in part;

6.    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

7.    to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code, including, without limitation, to enter an order or orders in addition to the Confirmation Order confirming and approving any sale or sales consummated at the Auction, should a buyer require the same, and making clear that any such sale is being made free and clear or liens, claims, and encumbrances as provided for in the Confirmation Order;

8.    to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

9.    to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses;

10.    to hear and determine disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan, or the extent of any Entity's obligations incurred in connection with or released or exculpated under the Plan;

11.    to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

12.    to determine any other matters that may arise in connection with or are related to the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection or to be executed in connection with the Plan;

13.    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

14.    to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code;

15.    to hear any motion to extend the time within which the Liquidating Trust must make distributions after the Effective Date; and

16.    to enter a Final Decree closing the Chapter 11 Cases.

# ARTICLE XIII.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.  Modification of Plan

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order.  Upon entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with sections 1191 and 1193 of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder and the votes of each Class for or against the Plan shall be counted and used in connection with the modified plan of liquidation.  The Debtors reserve the right to amend any exhibits or schedules to this Plan, whereupon each such amended exhibit or schedule shall be deemed substituted for the original of such exhibit.  The Liquidation Trustee shall provide notice of any amendments to any exhibit or schedule to the parties affected thereby.

After the Confirmation Date, the Debtors or Liquidating Trustee may, under sections 1191 and 1193 of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies within or among this Plan and the Confirmation Order, and to accomplish such matters as may be reasonably necessary to carry out the purposes and intent hereof.  A Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment, modification or remedy does not materially and adversely affect the treatment of the Claim or Equity Interest of such Holder hereunder.

### B.  Revocation, Withdrawal, or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of liquidation.  If the Plan is revoked or withdrawn, or if the Confirmation Order confirming the Plan is not entered or does not become a Final Order, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan,

shall (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or the Debtors' Estates, (2) prejudice in any manner the rights of the Debtors or their Estates, (3) constitute an admission of any sort by the Debtors, or (4) constitute a release of any Causes of Action possessed or maintained by the Estates.

**Dated: February 23, 2021**          **Respectfully submitted,**

By: */s/ Matthew E. McClintock*

Matthew E. McClintock, Esq.
Dan C. Curth, Esq.
**GOLDSTEIN & MCCLINTOCK LLLP**
111 W Washington Street, Suite 1221
Chicago, IL 60602
Tel: 312-337-7700
Fax: 312-277-2305
Email: mattm@goldmclaw.com
          danc@goldmclaw.com

*Counsel for the Debtors*